## HARRIS *v.* UNITED STATES

No. 00–10666.   Argued March 25, 2002—Decided June 24, 2002

546

KENNEDY, J., announced the judgment of the Court and delivered the opinion of the Court with respect to Parts I, II, and IV, in which REHNQUIST, C. J., and O'CONNOR, SCALIA, and BREYER, JJ., joined, and an opinion with respect to Part III, in which REHNQUIST, C. J., and O'CONNOR and SCALIA, JJ., joined. O'CONNOR, J., filed a concurring opinion, *post,* p. 569. BREYER, J., filed an opinion concurring in part and concurring in the judgment, *post,* p. 569. THOMAS, J., filed a dissenting opinion, in which STEVENS, SOUTER, and GINSBURG, JJ., joined, *post,* p. 572.

*William C. Ingram,* by appointment of the Court, 534 U. S. 1160, argued the cause for petitioner. With him on the briefs were *Louis C. Allen III, Elizabeth A. Flagg,* and *Jeffrey T. Green.*

*Deputy Solicitor General Dreeben* argued the cause for the United States. With him on the brief were *Solicitor General Olson, Assistant Attorney General Chertoff, Matthew D. Roberts,* and *Nina Goodman.**

---

*Briefs of *amici curiae* urging reversal were filed for the Cato Institute et al. by *Stephen P. Halbrook;* and for Families Against Mandatory Minimums Foundation by *Peter Goldberger* and *Mary Price.*

Briefs of *amici curiae* urging affirmance were filed for the State of New Jersey et al. by *David Samson,* Attorney General of New Jersey, and *Lisa Sarnoff Gochman,* Deputy Attorney General, and by the Attorneys General for their respective jurisdictions as follows: *Bruce M. Botelho* of Alaska, *Janet Napolitano* of Arizona, *Ken Salazar* of Colorado, *M. Jane Brady* of Delaware, *Robert A. Butterworth* of Florida, *James E. Ryan* of Illinois, *Carla J. Stovall* of Kansas, *Richard P. Ieyoub* of Louisiana, *J. Joseph Curran, Jr.,* of Maryland, *Thomas F. Reilly* of Massachusetts, *Michael C. Moore* of Mississippi, *Jeremiah W. (Jay) Nixon* of Missouri, *Mike McGrath* of Montana, *Don Stenberg* of Nebraska, *Frankie Sue Del Papa*

JUSTICE KENNEDY announced the judgment of the Court and delivered the opinion of the Court with respect to Parts I, II, and IV, and an opinion with respect to Part III, in which THE CHIEF JUSTICE, JUSTICE O'CONNOR, and JUSTICE SCALIA join.

Once more we consider the distinction the law has drawn between the elements of a crime and factors that influence a criminal sentence. Legislatures define crimes in terms of the facts that are their essential elements, and constitutional guarantees attach to these facts. In federal prosecutions, "[n]o person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury" alleging all the elements of the crime. U. S. Const., Amdt. 5; see *Hamling* v. *United States*, 418 U. S. 87, 117 (1974). "In all criminal prosecutions," state and federal, "the accused shall enjoy the right to . . . trial . . . by an impartial jury," U. S. Const., Amdt. 6; see *Duncan* v. *Louisiana*, 391 U. S. 145, 149 (1968), at which the government must prove each element beyond a reasonable doubt, see *In re Winship*, 397 U. S. 358, 364 (1970).

Yet not all facts affecting the defendant's punishment are elements. After the accused is convicted, the judge may impose a sentence within a range provided by statute, basing it on various facts relating to the defendant and the manner in which the offense was committed. Though these facts may have a substantial impact on the sentence, they are not elements, and are thus not subject to the Constitution's indictment, jury, and proof requirements. Some statutes also direct judges to give specific weight to certain facts when choosing the sentence. The statutes do not require these

of Nevada, *Betty D. Montgomery* of Ohio, *D. Michael Fisher* of Pennsylvania, *Mark Barnett* of South Dakota, *Paul G. Summers* of Tennessee, *John Cornyn* of Texas, *Mark L. Shurtleff* of Utah, *William Sorrell* of Vermont, *Elliot M. Davis* of the Virgin Islands, and *Darrell V. McGraw, Jr.,* of West Virginia; and for the Criminal Justice Legal Foundation by *Kent S. Scheidegger* and *Charles L. Hobson.*

facts, sometimes referred to as sentencing factors, to be alleged in the indictment, submitted to the jury, or established beyond a reasonable doubt.

The Constitution permits legislatures to make the distinction between elements and sentencing factors, but it imposes some limitations as well. For if it did not, legislatures could evade the indictment, jury, and proof requirements by labeling almost every relevant fact a sentencing factor. The Court described one limitation in this respect two Terms ago in *Apprendi* v. *New Jersey*, 530 U. S. 466, 490 (2000): "Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum," whether the statute calls it an element or a sentencing factor, "must be submitted to a jury, and proved beyond a reasonable doubt." Fourteen years before, in *McMillan* v. *Pennsylvania*, 477 U. S. 79 (1986), the Court had declined to adopt a more restrictive constitutional rule. *McMillan* sustained a statute that increased the minimum penalty for a crime, though not beyond the statutory maximum, when the sentencing judge found, by a preponderance of the evidence, that the defendant had possessed a firearm.

The principal question before us is whether *McMillan* stands after *Apprendi*.

I

Petitioner William Joseph Harris sold illegal narcotics out of his pawnshop with an unconcealed semiautomatic pistol at his side. He was later arrested for violating federal drug and firearms laws, including 18 U. S. C. § 924(c)(1)(A). That statute provides in relevant part:

> "[A]ny person who, during and in relation to any crime of violence or drug trafficking crime . . . uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm, shall, in addition to the punishment provided for such crime of violence or drug trafficking crime—

"(i) be sentenced to a term of imprisonment of not less than 5 years;

"(ii) if the firearm is brandished, be sentenced to a term of imprisonment of not less than 7 years; and

"(iii) if the firearm is discharged, be sentenced to a term of imprisonment of not less than 10 years."

The Government proceeded on the assumption that § 924(c)(1)(A) defines a single crime and that brandishing is a sentencing factor to be considered by the judge after the trial. For this reason the indictment said nothing of brandishing and made no reference to subsection (ii). Instead, it simply alleged the elements from the statute's principal paragraph: that "during and in relation to a drug trafficking crime," petitioner had "knowingly carr[ied] a firearm." At a bench trial the United States District Court for the Middle District of North Carolina found petitioner guilty as charged.

Following his conviction, the presentence report recommended that petitioner be given the 7-year minimum because he had brandished the gun. Petitioner objected, citing this Court's decision in *Jones* v. *United States*, 526 U. S. 227 (1999), and arguing that, as a matter of statutory interpretation, brandishing is an element of a separate offense, an offense for which he had not been indicted or tried. At the sentencing hearing the District Court overruled the objection, found by a preponderance of the evidence that petitioner had brandished the gun, and sentenced him to seven years in prison.

In the Court of Appeals for the Fourth Circuit petitioner again pressed his statutory argument. He added that if brandishing is a sentencing factor as a statutory matter, the statute is unconstitutional in light of *Apprendi*—even though, as petitioner acknowledged, the judge's finding did not alter the maximum penalty to which he was exposed. Rejecting these arguments, the Court of Appeals affirmed. 243 F. 3d 806 (2001). Like every other Court of Appeals to have addressed the question, it held that the statute makes

brandishing a sentencing factor. *Id.*, at 812; accord, *United States* v. *Barton*, 257 F. 3d 433, 443 (CA5 2001); *United States* v. *Carlson*, 217 F. 3d 986, 989 (CA8 2000); *United States* v. *Pounds*, 230 F. 3d 1317, 1319 (CA11 2000). The court also held that the constitutional argument was foreclosed by *Mc-Millan.* 243 F. 3d,. at 809.

We granted certiorari, 534 U. S. 1064 (2001), and now affirm.

## II

We must first answer a threshold question of statutory construction: Did Congress make brandishing an element or a sentencing factor in § 924(c)(1)(A)? In the Government's view the text in question defines a single crime, and the facts in subsections (ii) and (iii) are considerations for the sentencing judge. Petitioner, on the other hand, contends that Congress meant the statute to define three different crimes. Subsection (ii), he says, creates a separate offense of which brandishing is an element. If petitioner is correct, he was neither indicted nor tried for that offense, and the 7-year minimum did not apply.

So we begin our analysis by asking what § 924(c)(1)(A) means. The statute does not say in so many words whether brandishing is an element or a sentencing factor, but the structure of the prohibition suggests it is the latter. Federal laws usually list all offense elements "in a single sentence" and separate the sentencing factors "into subsections." *Castillo* v. *United States*, 530 U. S. 120, 125 (2000). Here, § 924(c)(1)(A) begins with a lengthy principal paragraph listing the elements of a complete crime—"the basic federal offense of using or carrying a gun during and in relation to" a violent crime or drug offense. *Id.*, at 124. Toward the end of the paragraph is "the word 'shall,' which often divides offense-defining provisions from those that specify sentences." *Jones*, 526 U. S., at 233. And following "shall" are the separate subsections, which explain how defendants are to "be sentenced." Subsection (i) sets a catch-

all minimum and "certainly adds no further element." *Ibid.* Subsections (ii) and (iii), in turn, increase the minimum penalty if certain facts are present, and those subsections do not repeat the elements from the principal paragraph.

When a statute has this sort of structure, we can presume that its principal paragraph defines a single crime and its subsections identify sentencing factors. But even if a statute "has a look to it suggesting that the numbered subsections are only sentencing provisions," *id.*, at 232, the text might provide compelling evidence to the contrary. This was illustrated by the Court's decision in *Jones,* in which the federal carjacking statute, which had a similar structure, was interpreted as setting out the elements of multiple offenses.

The critical textual clues in this case, however, reinforce the single-offense interpretation implied by the statute's structure. Tradition and past congressional practice, for example, were perhaps the most important guideposts in *Jones.* The fact at issue there—serious bodily injury—is an element in numerous federal statutes, including two on which the carjacking statute was modeled; and the *Jones* Court doubted that Congress would have made this fact a sentencing factor in one isolated instance. *Id.,* at 235–237; see also *Castillo, supra,* at 126–127; *Almendarez-Torres* v. *United States,* 523 U. S. 224, 230 (1998). In contrast, there is no similar federal tradition of treating brandishing and discharging as offense elements. In *Castillo* v. *United States, supra,* the Court singled out brandishing as a paradigmatic sentencing factor: "Traditional sentencing factors often involve . . . special features of the manner in which a basic crime was carried out (*e. g.,* that the defendant . . . brandished a gun)." *Id.,* at 126. Under the Sentencing Guidelines, moreover, brandishing and discharging affect the sentences for numerous federal crimes. See, *e. g.,* United States Sentencing Commission, Guidelines Manual §§ 2A2.2(b)(2), 2B3.1(b)(2), 2B3.2(b)(3)(A), 2E2.1(b)(1), 2L1.1(b)(4) (Nov. 2001). Indeed, the Guidelines appear to have been the only antecedents for the statute's

brandishing provision. The term "brandished" does not appear in any federal offense-defining provision save 18 U. S. C. § 924(c)(1)(A), and did not appear there until 1998, when the statute was amended to take its current form. The numbered subsections were added then, describing, as sentencing factors often do, "special features of the manner in which" the statute's "basic crime" could be carried out. *Castillo, supra,* at 126. It thus seems likely that brandishing and discharging were meant to serve the same function under the statute as they do under the Guidelines.

We might have had reason to question that inference if brandishing or discharging altered the defendant's punishment in a manner not usually associated with sentencing factors. *Jones* is again instructive. There the Court accorded great significance to the "steeply higher penalties" authorized by the carjacking statute's three subsections, which enhanced the defendant's maximum sentence from 15 years, to 25 years, to life—enhancements the Court doubted Congress would have made contingent upon judicial factfinding. 526 U. S., at 233; see also *Castillo, supra,* at 131; *Almendarez-Torres, supra,* at 235–236. The provisions before us now, however, have an effect on the defendant's sentence that is more consistent with traditional understandings about how sentencing factors operate; the required findings constrain, rather than extend, the sentencing judge's discretion. Section 924(c)(1)(A) does not authorize the judge to impose "steeply higher penalties"—or higher penalties at all—once the facts in question are found. Since the subsections alter only the minimum, the judge may impose a sentence well in excess of seven years, whether or not the defendant brandished the firearm. The incremental changes in the minimum—from 5 years, to 7, to 10—are precisely what one would expect to see in provisions meant to identify matters for the sentencing judge's consideration.

Nothing about the text or history of the statute rebuts the presumption drawn from its structure. Against the single-

offense interpretation to which these considerations point, however, petitioner invokes the canon of constitutional avoidance. Under that doctrine, when "a statute is susceptible of two constructions, by one of which grave and doubtful constitutional questions arise and by the other of which such questions are avoided, our duty is to adopt the latter." *United States ex rel. Attorney General* v. *Delaware & Hudson Co.*, 213 U. S. 366, 408 (1909). It is at least an open question, petitioner contends, whether the Fifth and Sixth Amendments require every fact increasing a federal defendant's minimum sentence to be alleged in the indictment, submitted to the jury, and proved beyond a reasonable doubt. To avoid resolving that question (and possibly invalidating the statute), petitioner urges, we should read § 924(c)(1)(A) as making brandishing an element of an aggravated federal crime.

The avoidance canon played a role in *Jones,* for the subsections of the carjacking statute enhanced the maximum sentence, and a single-offense interpretation would have implicated constitutional questions later addressed—and resolved in the defendant's favor—by *Apprendi.* See *Jones, supra,* at 243, n. 6 ("[A]ny fact (other than prior conviction) that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt"). Yet the canon has no role to play here. It applies only when there are serious concerns about the statute's constitutionality, *Reno* v. *Flores,* 507 U. S. 292, 314, n. 9 (1993), and petitioner's proposed rule—that the Constitution requires any fact increasing the statutory minimum sentence to be accorded the safeguards assigned to elements—was rejected 16 years ago in *McMillan.* Petitioner acknowledges as much but argues that recent developments cast doubt on *McMillan*'s viability. To avoid deciding whether *McMillan* must be overruled, he says, we should construe the problem out of the statute.

Petitioner's suggestion that we use the canon to avoid overruling one of our own precedents is novel and, given that *McMillan* was in place when § 924(c)(1)(A) was enacted, unsound. The avoidance canon rests upon our "respect for Congress, which we assume legislates in the light of constitutional limitations." *Rust* v. *Sullivan*, 500 U. S. 173, 191 (1991). The statute at issue in this case was passed when *McMillan* provided the controlling instruction, and Congress would have had no reason to believe that it was approaching the constitutional line by following that instruction. We would not further the canon's goal of eliminating friction with our coordinate branch, moreover, if we alleviated our doubt about a constitutional premise we had supplied by adopting a strained reading of a statute that Congress had enacted in reliance on the premise. And if we stretched the text to avoid the question of *McMillan's* continuing vitality, the canon would embrace a dynamic view of statutory interpretation, under which the text might mean one thing when enacted yet another if the prevailing view of the Constitution later changed. We decline to adopt that approach.

As the avoidance canon poses no obstacle and the interpretive circumstances point in a common direction, we conclude that, as a matter of statutory interpretation, § 924(c)(1)(A) defines a single offense. The statute regards brandishing and discharging as sentencing factors to be found by the judge, not offense elements to be found by the jury.

## III

Confident that the statute does just what *McMillan* said it could, we consider petitioner's argument that § 924(c)(1)(A)(ii) is unconstitutional because *McMillan* is no longer sound authority. *Stare decisis* is not an "inexorable command," *Burnet* v. *Coronado Oil & Gas Co.*, 285 U. S. 393, 405 (1932) (Brandeis, J., dissenting), but the doctrine is "of fundamental importance to the rule of law," *Welch* v. *Texas*

*Dept. of Highways and Public Transp.,* 483 U. S. 468, 494 (1987). Even in constitutional cases, in which *stare decisis* concerns are less pronounced, we will not overrule a precedent absent a "special justification." *Arizona* v. *Rumsey,* 467 U. S. 203, 212 (1984).

The special justification petitioner offers is our decision in *Apprendi,* which, he says, cannot be reconciled with *McMillan.* Cf. *Ring* v. *Arizona, post,* at 609 (overruling *Walton* v. *Arizona,* 497 U. S. 639 (1990), because "*Walton* and *Apprendi* are irreconcilable"). We do not find the argument convincing. As we shall explain, *McMillan* and *Apprendi* are consistent because there is a fundamental distinction between the factual findings that were at issue in those two cases. *Apprendi* said that any fact extending the defendant's sentence beyond the maximum authorized by the jury's verdict would have been considered an element of an aggravated crime—and thus the domain of the jury—by those who framed the Bill of Rights. The same cannot be said of a fact increasing the mandatory minimum (but not extending the sentence beyond the statutory maximum), for the jury's verdict has authorized the judge to impose the minimum with or without the finding. As *McMillan* recognized, a statute may reserve this type of factual finding for the judge without violating the Constitution.

Though defining criminal conduct is a task generally "left to the legislative branch," *Patterson* v. *New York,* 432 U. S. 197, 210 (1977), Congress may not manipulate the definition of a crime in a way that relieves the Government of its constitutional obligations to charge each element in the indictment, submit each element to the jury, and prove each element beyond a reasonable doubt, *Jones,* 526 U. S., at 240–241; *Mullaney* v. *Wilbur,* 421 U. S. 684, 699 (1975). *McMillan* and *Apprendi* asked whether certain types of facts, though labeled sentencing factors by the legislature, were nevertheless "traditional elements" to which these constitutional safe-

guards were intended to apply. *Patterson* v. *New York, supra,* at 211, n. 12.

*McMillan*'s answer stemmed from certain historical and doctrinal understandings about the role of the judge at sentencing. The mid-19th century produced a general shift in this country from criminal statutes "providing fixed-term sentences to those providing judges discretion within a permissible range." *Apprendi,* 530 U. S., at 481. Under these statutes, judges exercise their sentencing discretion through "an inquiry broad in scope, largely unlimited either as to the kind of information [they] may consider, or the source from which it may come." *United States* v. *Tucker,* 404 U. S. 443, 446 (1972). The Court has recognized that this process is constitutional—and that the facts taken into consideration need not be alleged in the indictment, submitted to the jury, or proved beyond a reasonable doubt. See, *e. g., United States* v. *Watts,* 519 U. S. 148, 156 (1997) *(per curiam); Nichols* v. *United States,* 511 U. S. 738, 747 (1994); *Williams* v. *New York,* 337 U. S. 241, 246 (1949). As the Court reiterated in *Jones:* "It is not, of course, that anyone today would claim that every fact with a bearing on sentencing must be found by a jury; we have resolved that general issue and have no intention of questioning its resolution." 526 U. S., at 248. Judicial factfinding in the course of selecting a sentence within the authorized range does not implicate the indictment, jury-trial, and reasonable-doubt components of the Fifth and Sixth Amendments.

That proposition, coupled with another shift in prevailing sentencing practices, explains *McMillan.* In the latter part of the 20th century, many legislatures, dissatisfied with sentencing disparities among like offenders, implemented measures regulating judicial discretion. These systems maintained the statutory ranges and the judge's factfinding role but assigned a uniform weight to factors judges often relied upon when choosing a sentence. See, *e. g., Payne* v. *Tennessee,* 501 U. S. 808, 820 (1991). One example of reform, the

kind addressed in *McMillan,* was mandatory minimum sentencing. The Pennsylvania Mandatory Minimum Sentencing Act, 42 Pa. Cons. Stat. § 9712 (1982), imposed a minimum prison term of five years when the sentencing judge found, by a preponderance of the evidence, that the defendant had possessed a firearm while committing the crime of conviction.

In sustaining the statute the *McMillan* Court placed considerable reliance on the similarity between the sentencing factor at issue and the facts judges contemplate when exercising their discretion within the statutory range. Given that the latter are not elements of the crime, the Court explained, neither was the former:

> "Section 9712 neither alters the maximum penalty for the crime committed nor creates a separate offense calling for a separate penalty; it operates solely to limit the sentencing court's discretion in selecting a penalty within the range already available to it without the special finding of visible possession of a firearm. Section 9712 'ups the ante' for the defendant only by raising to five years the minimum sentence which may be imposed within the statutory plan. . . . Petitioners' claim that visible possession under the Pennsylvania statute is 'really' an element of the offenses for which they are being punished . . . would have at least more superficial appeal if a finding of visible possession exposed them to greater or additional punishment, . . . but it does not." 477 U. S., at 87–88 (footnote omitted).

In response to the argument that the Act evaded the Constitution's procedural guarantees, the Court noted that the statute "simply took one factor that has always been considered by sentencing courts to bear on punishment . . . and dictated the precise weight to be given that factor." *Id.,* at 89–90.

That reasoning still controls. If the facts judges consider when exercising their discretion within the statutory range are not elements, they do not become as much merely because legislatures require the judge to impose a minimum sentence when those facts are found—a sentence the judge could have imposed absent the finding. It does not matter, for the purposes of the constitutional analysis, that in statutes like the Pennsylvania Act the "State provides" that a fact "shall give rise both to a special stigma and to a special punishment." *Id.*, at 103 (STEVENS, J., dissenting). Judges choosing a sentence within the range do the same, and "[j]udges, it is sometimes necessary to remind ourselves, are part of the State." *Apprendi, supra*, at 498 (SCALIA, J., concurring). These facts, though stigmatizing and punitive, have been the traditional domain of judges; they have not been alleged in the indictment or proved beyond a reasonable doubt. There is no reason to believe that those who framed the Fifth and Sixth Amendments would have thought of them as the elements of the crime.

This conclusion might be questioned if there were extensive historical evidence showing that facts increasing the defendant's minimum sentence (but not affecting the maximum) have, as a matter of course, been treated as elements. The evidence on this score, however, is lacking. Statutes like the Pennsylvania Act, which alter the minimum sentence without changing the maximum, were for the most part the product of the 20th century, when legislatures first asserted control over the sentencing judge's discretion. Courts at the founding (whose views might be relevant, given the contemporaneous adoption of the Bill of Rights, see *Apprendi*, 530 U. S., at 478–484) and in the mid-19th century (whose views might be relevant, given that sentencing ranges first arose then, see *id.*, at 501–518 (THOMAS, J., concurring)) were not as a general matter required to decide whether a fact giving rise to a mandatory minimum sentence within the available range was to be alleged in the indictment and

proved to the jury. See King & Klein, Essential Elements, 54 Vand. L. Rev. 1467, 1474–1477 (2001). Indeed, though there is no clear record of how history treated these facts, it is clear that they did not fall within the principle by which history determined what facts were elements. That principle defined elements as "fact[s] . . . legally essential to the punishment to be inflicted." *United States* v. *Reese*, 92 U. S. 214, 232 (1876) (Clifford, J., dissenting) (citing 1 J. Bishop, Law of Criminal Procedure § 81, p. 51 (2d ed. 1872)). This formulation includes facts that, as *McMillan* put it, "alte[r] the maximum penalty," 477 U. S., at 87, but it does not include facts triggering a mandatory minimum. The minimum may be imposed with or without the factual finding; the finding is by definition not "essential" to the defendant's punishment.

*McMillan* was on firm historical ground, then, when it held that a legislature may specify the condition for a mandatory minimum without making the condition an element of the crime. The fact of visible firearm possession was more like the facts considered by judges when selecting a sentence within the statutory range—facts that, as the authorities from the 19th century confirm, have never been charged in the indictment, submitted to the jury, or proved beyond a reasonable doubt:

> "[W]ithin the limits of any discretion as to the punishment which the law may have allowed, the judge, when he pronounces sentence, may suffer his discretion to be influenced by matter shown in aggravation or mitigation, not covered by the allegations of the indictment. Where the law permits the heaviest punishment, on a scale laid down, to be inflicted, and has merely committed to the judge the authority to interpose its mercy and inflict a punishment of a lighter grade, no rights of the accused are violated though in the indictment there is no mention of mitigating circumstances. The aggravating circumstances spoken of cannot swell the penalty

above what the law has provided for the acts charged against the prisoner, and they are interposed merely to check the judicial discretion in the exercise of the permitted mercy. This is an entirely different thing from punishing one for what is not alleged against him." Bishop, Criminal Procedure § 85, at 54.

Since sentencing ranges came into use, defendants have not been able to predict from the face of the indictment precisely what their sentence will be; the charged facts have simply made them aware of the "heaviest punishment" they face if convicted. *Ibid.* Judges, in turn, have always considered uncharged "aggravating circumstances" that, while increasing the defendant's punishment, have not "swell[ed] the penalty above what the law has provided for the acts charged." *Ibid.* Because facts supporting a mandatory minimum fit squarely within that description, the legislature's choice to entrust them to the judge does not implicate the "competition . . . between judge and jury over . . . their respective roles," *Jones*, 526 U. S., at 245, that is the central concern of the Fifth and Sixth Amendments.

At issue in *Apprendi*, by contrast, was a sentencing factor that did "swell the penalty above what the law has provided," Bishop, *supra*, § 85, at 54, and thus functioned more like a "traditional elemen[t]." *Patterson* v. *New York*, 432 U. S., at 211, n. 12. The defendant had been convicted of illegal possession of a firearm, an offense for which New Jersey law prescribed a maximum of 10 years in prison. See N. J. Stat. Ann. §§ 2C:39–4(a), 2C:43–6(a)(2) (1995). He was sentenced to 12 years, however, because a separate statute permitted an enhancement when the judge found, by a preponderance of the evidence, that the defendant "acted with a purpose to intimidate an individual or group of individuals because of race." § 2C:44–3(e) (Supp. 2001–2002).

The Court held that the enhancement was unconstitutional. "[O]ur cases in this area, and . . . the history upon which they rely," the Court observed, confirmed the constitu-

tional principle first identified in *Jones:* "Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 530 U. S., at 490. Those facts, *Apprendi* held, were what the Framers had in mind when they spoke of "crimes" and "criminal prosecutions" in the Fifth and Sixth Amendments: A crime was not alleged, and a criminal prosecution not complete, unless the indictment and the jury verdict included all the facts to which the legislature had attached the maximum punishment. Any "fact that . . . exposes the criminal defendant to a penalty *exceeding* the maximum he would receive if punished according to the facts reflected in the jury verdict alone," the Court concluded, *id.,* at 483, would have been, under the prevailing historical practice, an element of an aggravated offense. See *id.,* at 479–481; see also *id.,* at 501–518 (THOMAS, J., concurring).

*Apprendi*'s conclusions do not undermine *McMillan*'s. There was no comparable historical practice of submitting facts increasing the mandatory minimum to the jury, so the *Apprendi* rule did not extend to those facts. Indeed, the Court made clear that its holding did not affect *McMillan* at all:

> "We do not overrule *McMillan.* We limit its holding to cases that do not involve the imposition of a sentence more severe than the statutory maximum for the offense established by the jury's verdict—a limitation identified in the *McMillan* opinion itself." 530 U. S., at 487, n. 13.

The sentencing factor in *McMillan* did not increase "the penalty for a crime beyond the prescribed statutory maximum," 530 U. S., at 490; nor did it, as the concurring opinions in *Jones* put it, "alter the congressionally prescribed range of penalties to which a criminal defendant is exposed," 526 U. S., at 253 (SCALIA, J., concurring). As the *Apprendi* Court observed, the *McMillan* finding merely required the

judge to impose "a specific sentence *within the range* authorized by the jury's finding that the defendant [was] guilty." 530 U. S., at 494, n. 19; see also *Jones, supra,* at 242 ("[T]he *Winship* issue [in *McMillan*] rose from a provision that a judge's finding (by a preponderance) of visible possession of a firearm would require a mandatory minimum sentence for certain felonies, but a minimum that fell within the sentencing ranges otherwise prescribed").

As its holding and the history on which it was based would suggest, the *Apprendi* Court's understanding of the Constitution is consistent with the holding in *McMillan.* Facts extending the sentence beyond the statutory maximum had traditionally been charged in the indictment and submitted to the jury, *Apprendi* said, because the function of the indictment and jury had been to authorize the State to impose punishment:

> "The evidence . . . that punishment was, by law, tied to the offense . . . and the evidence that American judges have exercised sentencing discretion within a legally prescribed range . . . point to a single, consistent conclusion: The judge's role in sentencing is constrained at its outer limits by the facts alleged in the indictment and found by the jury. Put simply, facts that expose a defendant to a punishment greater than that otherwise legally prescribed were by definition 'elements' of a separate legal offense." 530 U. S., at 483, n. 10.

The grand and petit juries thus form a " 'strong and two-fold barrier . . . between the liberties of the people and the prerogative of the [government].' " *Duncan* v. *Louisiana,* 391 U. S., at 151 (quoting W. Blackstone, Commentaries on the Laws of England 349 (T. Cooley ed. 1899)). Absent authorization from the trial jury—in the form of a finding, by proof beyond a reasonable doubt, of the facts warranting the extended sentence under the New Jersey statute—the State had no power to sentence the defendant to more than

10 years, the maximum "authorized by the jury's guilty verdict." *Apprendi*, 530 U. S., at 494. "[T]hose facts that determine the maximum sentence the law allows," then, are necessarily elements of the crime. *Id.*, at 499 (SCALIA, J., concurring).

Yet once the jury finds all those facts, *Apprendi* says that the defendant has been convicted of the crime; the Fifth and Sixth Amendments have been observed; and the Government has been authorized to impose any sentence below the maximum. That is why, as *Apprendi* noted, "nothing in this history suggests that it is impermissible for judges to exercise discretion—taking into consideration various factors relating both to offense and offender—in imposing a judgment *within the range.*" *Id.*, at 481. That is also why, as *McMillan* noted, nothing in this history suggests that it is impermissible for judges to find facts that give rise to a mandatory minimum sentence below "the maximum penalty for the crime committed." 477 U. S., at 87–88. In both instances the judicial factfinding does not "expose a defendant to a punishment greater than that otherwise legally prescribed." *Apprendi, supra*, at 483, n. 10. Whether chosen by the judge or the legislature, the facts guiding judicial discretion below the statutory maximum need not be alleged in the indictment, submitted to the jury, or proved beyond a reasonable doubt. When a judge sentences the defendant to a mandatory minimum, no less than when the judge chooses a sentence within the range, the grand and petit juries already have found all the facts necessary to authorize the Government to impose the sentence. The judge may impose the minimum, the maximum, or any other sentence within the range without seeking further authorization from those juries—and without contradicting *Apprendi*.

Petitioner argues, however, that the concerns underlying *Apprendi* apply with equal or more force to facts increasing the defendant's minimum sentence. Those factual findings, he contends, often have a greater impact on the defendant

than the findings at issue in *Apprendi*. This is so because when a fact increasing the statutory maximum is found, the judge may still impose a sentence far below that maximum; but when a fact increasing the minimum is found, the judge has no choice but to impose that minimum, even if he or she otherwise would have chosen a lower sentence. Cf. *Almendarez-Torres*, 523 U. S., at 244–245. Why, petitioner asks, would fairness not also require the latter sort of fact to be alleged in the indictment and found by the jury under a reasonable-doubt standard? The answer is that because it is beyond dispute that the judge's choice of sentences within the authorized range may be influenced by facts not considered by the jury, a factual finding's practical effect cannot by itself control the constitutional analysis. The Fifth and Sixth Amendments ensure that the defendant "will never get *more* punishment than he bargained for when he did the crime," but they do not promise that he will receive "anything less" than that. *Apprendi, supra,* at 498 (SCALIA, J., concurring). If the grand jury has alleged, and the trial jury has found, all the facts necessary to impose the maximum, the barriers between government and defendant fall. The judge may select any sentence within the range, based on facts not alleged in the indictment or proved to the jury— even if those facts are specified by the legislature, and even if they persuade the judge to choose a much higher sentence than he or she otherwise would have imposed. That a fact affects the defendant's sentence, even dramatically so, does not by itself make it an element.

In light of the foregoing, it is not surprising that the decisions for the Court in both *Apprendi* and *Jones* insisted that they were consistent with *McMillan*—and that a distinction could be drawn between facts increasing the defendant's minimum sentence and facts extending the sentence beyond the statutory maximum. See, *e. g., Apprendi, supra,* at 494, n. 19 ("The term [sentencing factor] appropriately describes a circumstance, which may be either aggravating or mitigat-

ing in character, that supports a specific sentence *within the range* authorized by the jury's finding that the defendant is guilty of a particular offense"); *Jones,* 526 U. S., at 242 (*"McMillan,* then, recognizes a question under both the Due Process Clause of the Fourteenth Amendment and the jury guarantee of the Sixth: . . . [M]ay judicial factfinding by a preponderance support the application of a provision that increases the potential severity of the penalty for a variant of a given crime?"); see also *Almendarez-Torres, supra,* at 256 (SCALIA, J., dissenting) ("[N]o one can read *McMillan . . .* without perceiving that the determinative element in our validation of the Pennsylvania statute was the fact that it merely limited the sentencing judge's discretion within the range of penalty already available, *rather than* substantially increasing the available sentence"). That distinction may continue to stand. The factual finding in *Apprendi* extended the power of the judge, allowing him or her to impose a punishment exceeding what was authorized by the jury. The finding in *McMillan* restrained the judge's power, limiting his or her choices within the authorized range. It is quite consistent to maintain that the former type of fact must be submitted to the jury while the latter need not be.

Read together, *McMillan* and *Apprendi* mean that those facts setting the outer limits of a sentence, and of the judicial power to impose it, are the elements of the crime for the purposes of the constitutional analysis. Within the range authorized by the jury's verdict, however, the political system may channel judicial discretion—and rely upon judicial expertise—by requiring defendants to serve minimum terms after judges make certain factual findings. It is critical not to abandon that understanding at this late date. Legislatures and their constituents have relied upon *McMillan* to exercise control over sentencing through dozens of statutes like the one the Court approved in that case. Congress and the States have conditioned mandatory minimum sentences upon judicial findings that, as here, a firearm was possessed,

brandished, or discharged, Ala. Code § 13A–5–6(a)(4) (1994); Kan. Stat. Ann. § 21–4618 (1995); Minn. Stat. Ann. § 609.11 (Supp. 2002); N. J. Stat. Ann. §§ 2C:43–6(c), 6(d) (1998); or among other examples, that the victim was over 60 years of age, 42 Pa. Cons. Stat. § 9717(a) (1998); that the defendant possessed a certain quantity of drugs, Ill. Comp. Stat., ch. 730, § 5/5–5–3(c)(2)(D) (2000); that the victim was related to the defendant, Alaska Stat. § 12.55.125(b) (2000); and that the defendant was a repeat offender, Md. Ann. Code, Art. 27, § 286 (Supp. 2000). We see no reason to overturn those statutes or cast uncertainty upon the sentences imposed under them.

## IV

Reaffirming *McMillan* and employing the approach outlined in that case, we conclude that the federal provision at issue, 18 U. S. C. § 924(c)(1)(A)(ii), is constitutional. Basing a 2-year increase in the defendant's minimum sentence on a judicial finding of brandishing does not evade the requirements of the Fifth and Sixth Amendments. Congress "simply took one factor that has always been considered by sentencing courts to bear on punishment . . . and dictated the precise weight to be given that factor." *McMillan*, 477 U. S., at 89–90. That factor need not be alleged in the indictment, submitted to the jury, or proved beyond a reasonable doubt.

The Court is well aware that many question the wisdom of mandatory minimum sentencing. Mandatory minimums, it is often said, fail to account for the unique circumstances of offenders who warrant a lesser penalty. See, *e. g.*, Brief for Families Against Mandatory Minimums Foundation as *Amicus Curiae* 25, n. 16; cf. *Almendarez-Torres, supra*, at 245 (citing United States Sentencing Commission, Mandatory Minimum Penalties in the Federal Criminal Justice System 26–34 (Aug. 1991)). These criticisms may be sound, but they would persist whether the judge or the jury found the facts giving rise to the minimum. We hold only that the

Constitution permits the judge to do so, and we leave the other questions to Congress, the States, and the democratic processes.

The judgment of the Court of Appeals is affirmed.

*It is so ordered.*

JUSTICE O'CONNOR, concurring.

Petitioner bases his statutory argument that brandishing must be interpreted as an offense element on *Jones* v. *United States*, 526 U. S. 227 (1999). He bases his constitutional argument that regardless of how the statute is interpreted, brandishing must be charged in the indictment and found by the jury beyond a reasonable doubt on *Apprendi* v. *New Jersey,* 530 U. S. 466 (2000). As I dissented in *Jones* and *Apprendi* and still believe both were wrongly decided, I find it easy to reject petitioner's arguments. Even assuming the validity of *Jones* and *Apprendi,* however, I agree that petitioner's arguments that brandishing must be charged in the indictment and found by the jury beyond a reasonable doubt are unavailing. I therefore join JUSTICE KENNEDY's opinion in its entirety.

JUSTICE BREYER, concurring in part and concurring in the judgment.

I cannot easily distinguish *Apprendi* v. *New Jersey*, 530 U. S. 466 (2000), from this case in terms of logic. For that reason, I cannot agree with the plurality's opinion insofar as it finds such a distinction. At the same time, I continue to believe that the Sixth Amendment permits judges to apply sentencing factors—whether those factors lead to a sentence beyond the statutory maximum (as in *Apprendi*) or the application of a mandatory minimum (as here). And because I believe that extending *Apprendi* to mandatory minimums would have adverse practical, as well as legal, consequences, I cannot yet accept its rule. I therefore join the Court's

judgment, and I join its opinion to the extent that it holds that *Apprendi* does not apply to mandatory minimums.

In saying this, I do not mean to suggest my approval of mandatory minimum sentences as a matter of policy. During the past two decades, as mandatory minimum sentencing statutes have proliferated in number and importance, judges, legislators, lawyers, and commentators have criticized those statutes, arguing that they negatively affect the fair administration of the criminal law, a matter of concern to judges and to legislators alike. See, *e. g.*, Remarks of Chief Justice William H. Rehnquist, Nat. Symposium on Drugs and Violence in America 9–11 (June 18, 1993); Kennedy, Hearings before a Subcommittee of the House Committee on Appropriations, 103d Cong., 2d Sess., 29 (Mar. 9, 1994) (mandatory minimums are "imprudent, unwise and often an unjust mechanism for sentencing"); Breyer, Federal Sentencing Guidelines Revisited, 14 Crim. Justice 28 (Spring 1999); Hatch, The Role of Congress in Sentencing: The United States Sentencing Commission, Mandatory Minimum Sentences, and the Search for a Certain and Effective Sentencing System, 28 Wake Forest L. Rev. 185, 192–196 (1993); Schulhofer, Rethinking Mandatory Minimums, 28 Wake Forest L. Rev. 199 (1993); Raeder, Rethinking Sentencing and Correctional Policy for Nonviolent Drug Offenders, 14 Crim. Justice 1, 53 (Summer 1999) (noting that the American Bar Association has opposed mandatory minimum sentences since 1974).

Mandatory minimum statutes are fundamentally inconsistent with Congress' simultaneous effort to create a fair, honest, and rational sentencing system through the use of Sentencing Guidelines. Unlike Guideline sentences, statutory mandatory minimums generally deny the judge the legal power to depart downward, no matter how unusual the special circumstances that call for leniency. See *Melendez* v. *United States*, 518 U. S. 120, 132–133 (1996) (BREYER, J., concurring in part and dissenting in part); cf. *Koon* v. *United States*, 518 U. S. 81, 95–96 (1996). They rarely reflect an ef-

fort to achieve sentencing proportionality—a key element of sentencing fairness that demands that the law punish a drug "kingpin" and a "mule" differently. They transfer sentencing power to prosecutors, who can determine sentences through the charges they decide to bring, and who thereby have reintroduced much of the sentencing disparity that Congress created Guidelines to eliminate. U. S. Sentencing Comm'n, Special Report to Congress: Mandatory Minimum Penalties in the Federal Criminal Justice System i–iv, 31–33 (1991) (Sentencing Report); see also Schulhofer, *supra*, at 214–220. They rarely are based upon empirical study. See Rehnquist, *supra*, at 9–10; Hatch, *supra*, at 198. And there is evidence that they encourage subterfuge, leading to more frequent downward departures (on a random basis), thereby making them a comparatively ineffective means of guaranteeing tough sentences. See Sentencing Report 53.

Applying *Apprendi* in this case would not, however, lead Congress to abolish, or to modify, mandatory minimum sentencing statutes. Rather, it would simply require the prosecutor to charge, and the jury to find beyond a reasonable doubt, the existence of the "factor," say, the amount of unlawful drugs, that triggers the mandatory minimum. In many cases, a defendant, claiming innocence and arguing, say, mistaken identity, will find it impossible simultaneously to argue to the jury that the prosecutor has overstated the drug amount. How, the jury might ask, could this "innocent" defendant know anything about that matter? The upshot is that in many such cases defendant and prosecutor will enter into a stipulation before trial as to drug amounts to be used at sentencing (if the jury finds the defendant guilty). To that extent, application of *Apprendi* would take from the judge the power to make a factual determination, while giving that power not to juries, but to prosecutors. And such consequences, when viewed through the prism of an open, fair sentencing system, are seriously adverse.

The legal consequences of extending *Apprendi* to the mandatory minimum sentencing context are also seriously adverse. Doing so would diminish further Congress' otherwise broad constitutional authority to define crimes through the specification of elements, to shape criminal sentences through the specification of sentencing factors, and to limit judicial discretion in applying those factors in particular cases. I have discussed these matters fully in my *Apprendi* dissent. See 530 U. S., at 555. For the reasons set forth there, and in other opinions, see *Jones* v. *United States*, 526 U. S. 227, 254 (1999) (KENNEDY, J., dissenting); *Almendarez-Torres* v. *United States*, 523 U. S. 224 (1998), I would not apply *Apprendi* in this case.

I consequently join Parts I, II, and IV of the Court's opinion and concur in its judgment.

JUSTICE THOMAS, with whom JUSTICE STEVENS, JUSTICE SOUTER, and JUSTICE GINSBURG join, dissenting.

The range of punishment to which petitioner William J. Harris was exposed turned on the fact that he brandished a firearm, a fact that was neither charged in his indictment nor proved at trial beyond a reasonable doubt. The United States Court of Appeals for the Fourth Circuit nonetheless held, in reliance on *McMillan* v. *Pennsylvania*, 477 U. S. 79 (1986), that the fact that Harris brandished a firearm was a mere sentencing factor to which no constitutional protections attach. 243 F. 3d 806, 808–812 (2001).

*McMillan*, however, conflicts with the Court's later decision in *Apprendi* v. *New Jersey*, 530 U. S. 466 (2000), as the dissenting opinion in *Apprendi* recognized. See *id.*, at 533 (O'CONNOR, J., dissenting). The Court's holding today therefore rests on either a misunderstanding or a rejection of the very principles that animated *Apprendi* just two years ago. Given that considerations of *stare decisis* are at their nadir in cases involving procedural rules implicating fundamental constitutional protections afforded criminal defend-

ants, I would reaffirm *Apprendi,* overrule *McMillan,* and reverse the Court of Appeals.

## I

Harris was indicted for distributing marijuana in violation of 21 U. S. C. § 841 and for carrying a firearm "in relation to" a drug trafficking crime in violation of 18 U. S. C. § 924(c)(1)(A). Harris pleaded guilty to distributing marijuana but disputed that he had carried a firearm "in relation to" a drug trafficking crime. The District Court disagreed,[1] and he was convicted by the judge, having waived his right to trial by jury. Although the mandatory minimum prison sentence under § 924(c)(1)(A)(i) is five years in prison, the presentence report relied on § 924(c)(1)(A)(ii), which increases the mandatory minimum prison sentence to seven years when the firearm is brandished.[2] At sentencing, the District Court acknowledged that it was a "close question" whether Harris "brandished" a firearm, and noted that "[t]he only thing that happened here is [that] he had [a gun] during the drug transaction." App. 231–232, 244–247. The District Court nonetheless found by a preponderance of the evidence that Harris had brandished a firearm and as a result sentenced him to the minimum mandatory sentence of seven years' imprisonment for the violation of § 924(c)(1)(A).

Relying on *McMillan,* the Court of Appeals affirmed the sentence and held as a matter of statutory interpretation that brandishing is a sentencing factor, not an element of the § 924(c)(1)(A) offense. Accordingly, the Court of Appeals

---

[1] Harris owned a pawn shop and routinely wore a gun at work; the District Court accepted that it was Harris' ordinary practice to wear a gun whether or not he was selling small amounts of marijuana to his friends. The District Court, however, determined that the gun was carried "in relation to" a drug trafficking offense within the meaning of § 924(c) because it was "unable to draw the distinction that if it is [carried] for a legitimate purpose, it cannot be for an illegitimate purpose." App. 163.

[2] The presentence report recommended that Harris be given a term of imprisonment of zero to six *months* for the distribution charge.

concluded that the allegation of brandishing a firearm did not need to be charged in the indictment or proved beyond a reasonable doubt in order for the 7-year mandatory minimum to be triggered.

## II

The Court construes § 924(c)(1)(A) to "defin[e] a single offense," *ante,* at 556, rather than the multiple offenses the Court found in a similarly structured statute in *Jones* v. *United States,* 526 U. S. 227 (1999).[3]  In reliance on *McMillan,* it then discounts the increasing mandatory minimum sentences set forth in the statutory provision as constitutionally irrelevant.   In the plurality's view, any punishment less than the statutory maximum of life imprisonment for any violation of § 924(c)(1)(A) avoids the single principle the Court now gleans from *Apprendi:* "'Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum,' whether the statute calls it an element or a sentencing factor, 'must be submitted to a jury, and proved beyond a reasonable doubt.'"   *Ante,* at 550 (quoting *Apprendi, supra,* at 490). According to the plurality, the historical practices underlying the Court's decision in *Apprendi* with respect to penalties that exceed the statutory maximum do not support extension of *Apprendi*'s rule to facts that increase a defendant's mandatory minimum sentence.   Such fine distinctions with regard to vital constitutional liberties cannot withstand close scrutiny.

## A

The Federal Constitution provides those "accused" in federal courts with specific rights, such as the right "to be informed of the nature and cause of the accusation," the right to be "held to answer for a capital, or otherwise infamous crime" only on an indictment or presentment of a grand jury, and the right to be tried by "an impartial jury of the State

---

[3] See 18 U. S. C. § 2119.

and district wherein the crime shall have been committed."
Amdts. 5 and 6. Also, no Member of this Court disputes
that due process requires that every fact necessary to con-
stitute a crime must be found beyond a reasonable doubt
by a jury if that right is not waived. See *In re Winship*, 397
U. S. 358, 364 (1970). As with *Apprendi*, this case thus
turns on the seemingly simple question of what constitutes
a "crime."

This question cannot be answered by reference to statu-
tory construction alone solely because the sentence does not
exceed the statutory maximum. As I discussed at great
length in *Apprendi*, the original understanding of what facts
are elements of a crime was expansive:

> "[I]f the legislature defines some core crime and then
> provides for increasing the punishment of that crime
> upon a finding of some aggravating fact—of whatever
> sort, including the fact of a prior conviction—the core
> crime and the aggravating fact together constitute an
> aggravated crime, just as much as grand larceny is an
> aggravated form of petit larceny. The aggravating fact
> is an element of the aggravated crime. Similarly, if the
> legislature, rather than creating grades of crimes, has
> provided for setting the punishment of a crime based on
> some fact . . . that fact is also an element. No multifac-
> tor parsing of statutes, of the sort that we have at-
> tempted since *McMillan*, is necessary. One need only
> look to the kind, degree, or range of punishment to
> which the prosecution is by law entitled for a given set
> of facts. Each fact for that entitlement is an element."
> 530 U. S., at 501 (concurring opinion).

The fact that a defendant brandished a firearm indisput-
ably alters the prescribed range of penalties to which he
is exposed under 18 U. S. C. §924(c)(1)(A). Without a find-
ing that a defendant brandished or discharged a firearm, the
penalty range for a conviction under §924(c)(1)(A)(i) is five

years to life in prison. But with a finding that a defendant brandished a firearm, the penalty range becomes harsher, seven years to life imprisonment. § 924(c)(1)(A)(ii). And if the court finds that a defendant discharged a firearm, the range becomes even more severe, 10 years to life. § 924(c)(1)(A)(iii). Thus, it is ultimately beside the point whether as a matter of statutory interpretation brandishing is a sentencing factor, because as a constitutional matter brandishing must be deemed an element of an aggravated offense. See *Apprendi, supra,* at 483, n. 10 ("[F]acts that expose a defendant to a punishment greater than that otherwise legally prescribed were by definition 'elements' of a separate legal offense").

I agree with the Court that a legislature is free to decree, within constitutional limits, which facts are elements that constitute a crime. See *ante,* at 550. But when the legislature provides that a particular fact shall give rise " 'both to a special stigma and to a special punishment,' " *ante,* at 560 (plurality opinion) (quoting *McMillan,* 477 U. S., at 103 (STEVENS, J., dissenting)), the constitutional consequences are clear. As the Court acknowledged in *Apprendi,* society has long recognized a necessary link between punishment and crime, 530 U. S., at 478 ("The defendant's ability to predict with certainty the judgment from the face of the felony indictment flowed from the invariable linkage of punishment with crime"). This link makes a great deal of sense: Why, after all, would anyone care if they were convicted of murder, as opposed to manslaughter, but for the increased penalties for the former offense, which in turn reflect the greater moral opprobrium society attaches to the act? We made clear in *Apprendi* that if a statute " 'annexes a higher degree of punishment' " based on certain circumstances, exposing a defendant to that higher degree of punishment requires that those circumstances be charged in the indictment and proved beyond a reasonable doubt. *Id.,* at 480 (quoting J. Archbold, Pleading and Evidence in Criminal Cases 51 (15th ed. 1862)).

This constitutional limitation neither interferes with the legislature's ability to define statutory ranges of punishment nor calls into question judicial discretion to impose "judgment *within the range* prescribed by statute." *Apprendi*, 530 U. S., at 481. But it does protect the criminal defendant's constitutional right to know, *ex ante*, those circumstances that will determine the applicable range of punishment and to have those circumstances proved beyond a reasonable doubt:

> "If a defendant faces punishment beyond that provided by statute when an offense is committed under certain circumstances but not others, it is obvious that both the loss of liberty and the stigma attaching to the offense are heightened; it necessarily follows that the defendant should not—at the moment the State is put to proof of those circumstances—be deprived of protections that have, until that point, unquestionably attached." *Id.,* at 484.

## B

The Court truncates this protection and holds that "facts, sometimes referred to as sentencing factors," do not need to be "alleged in the indictment, submitted to the jury, or established beyond a reasonable doubt," *ante*, at 550, so long as they do not increase the penalty for the crime beyond the statutory maximum. This is so even if the fact alters the statutorily mandated sentencing range, by increasing the mandatory minimum sentence. But to say that is in effect to claim that the imposition of a 7-year, rather than a 5-year, mandatory minimum does not change the constitutionally relevant sentence range because, regardless, either sentence falls between five years and the statutory maximum of life, the longest sentence range available under the statute. This analysis is flawed precisely because the statute provides incremental sentencing ranges, in which the mandatory minimum sentence varies upward if a defendant "brandished" or "discharged" a weapon. As a matter of common sense, an

increased mandatory minimum heightens the loss of liberty and represents the increased stigma society attaches to the offense. Consequently, facts that trigger an increased mandatory minimum sentence warrant constitutional safeguards.

Actual sentencing practices appear to bolster this conclusion. The suggestion that a 7-year sentence could be imposed even without a finding that a defendant brandished a firearm ignores the fact that the sentence imposed when a defendant is found only to have "carried" a firearm "in relation to" a drug trafficking offense appears to be, almost uniformly, if not invariably, five years. Similarly, those found to have brandished a firearm typically, if not always, are sentenced only to 7 years in prison while those found to have discharged a firearm are sentenced only to 10 years. Cf. United States Sentencing Commission, 2001 Datafile, USSCFY01, Table 1 (illustrating that almost all persons sentenced for violations of 18 U. S. C. § 924(c)(1)(A) are sentenced to 5, 7, or 10 years' imprisonment). This is true even though anyone convicted of violating § 924(c)(1)(A) is theoretically eligible to receive a sentence as severe as life imprisonment.[4] Yet under the decision today, those key facts actually responsible for fixing a defendant's punishment need not be charged in an indictment or proved beyond a reasonable doubt.

The incremental increase between five and seven years in prison may not seem so great in the abstract (of course it must seem quite different to a defendant actually being incarcerated). However, the constitutional analysis adopted by the plurality would hold equally true if the mandatory

---

[4] Indeed it is a certainty that in virtually every instance the sentence imposed for a § 924(c)(1)(A) violation is tied directly to the applicable mandatory minimum. See United States Sentencing Commission, Guidelines Manual § 2K2.4, comment., n. 1 (Nov. 2001) (stating clearly that "the guideline sentence for a defendant convicted under 18 U. S. C. § 924(c) . . . is the minimum term required by the relevant statute. . . . A sentence above the minimum term . . . is an upward departure").

minimum for a violation of § 924(c)(1) without brandishing was five years, but the mandatory minimum with brandishing was life imprisonment. The result must be the same because surely our fundamental constitutional principles cannot alter depending on degrees of sentencing severity. So long as it was clear that Congress intended for "brandishing" to be a sentencing factor, that fact would still have to be neither charged in the indictment nor proved beyond a reasonable doubt. But if this is the case, then *Apprendi* can easily be avoided by clever statutory drafting.

It is true that *Apprendi* concerned a fact that increased the penalty for a crime beyond the prescribed statutory maximum, but the principles upon which it relied apply with equal force to those facts that expose the defendant to a higher mandatory minimum: When a fact exposes a defendant to greater punishment than what is otherwise legally prescribed, that fact is "by definition [an] 'elemen[t]' of a separate legal offense." 530 U. S., at 483, n. 10. Whether one raises the floor or raises the ceiling it is impossible to dispute that the defendant is exposed to greater punishment than is otherwise prescribed.

This is no less true because mandatory minimum sentences are a 20th-century phenomena. As the Government acknowledged at oral argument, this fact means only that historical practice is not directly dispositive of the question whether facts triggering mandatory minimums must be treated like elements. Tr. of Oral Arg. 47. The Court has not previously suggested that constitutional protection ends where legislative innovation or ingenuity begins. Looking to the principles that animated the decision in *Apprendi* and the bases for the historical practice upon which *Apprendi* rested (rather than to the historical pedigree of mandatory minimums), there are no logical grounds for treating facts triggering mandatory minimums any differently than facts that increase the statutory maximum. In either case the defendant cannot predict the judgment from the face of the

felony, see 530 U. S., at 478–479, and the absolute statutory limits of his punishment change, constituting an increased penalty. In either case the defendant must be afforded the procedural protections of notice, a jury trial, and a heightened standard of proof with respect to the facts warranting exposure to a greater penalty. See *id.*, at 490; *Jones*, 526 U. S., at 253 (SCALIA, J., concurring).

## III

*McMillan* rested on the premise that the "'applicability of the reasonable-doubt standard . . . has always been dependent on how a State defines the offense that is charged in any given case.'" 477 U. S., at 85 (quoting *Patterson* v. *New York*, 432 U. S. 197, 211, n. 12 (1977)). Thus, it cannot withstand the logic of *Apprendi*, at least with respect to facts for which the legislature has prescribed a new statutory sentencing range. *McMillan* broke from the "traditional understanding" of crime definition, a tradition that "continued well into the 20th century, at least until the middle of the century." *Apprendi, supra*, at 518 (THOMAS, J., concurring). The Court in *McMillan* did not, therefore, acknowledge that the change in the prescribed sentence range upon the finding of particular facts changed the prescribed range of penalties in a constitutionally significant way. Rather, while recognizing applicable due process limits, it concluded that the mandatory minimum at issue did not increase the prescribed range of penalties but merely required the judge to impose a specific penalty "within the range already available to it." 477 U. S., at 87–88. As discussed, *supra*, at 577–579, this analysis is inherently flawed.

*Jones* called into question, and *Apprendi* firmly limited, a related precept underlying *McMillan:* namely, the State's authority to treat aggravated behavior as a factor increasing the sentence, rather than as an element of the crime. Although the plurality resurrects this principle, see *ante*, at 559–560, 565, it must do so in the face of the Court's contrary

conclusion in *Apprendi,* which adopts the position taken by the dissent in *McMillan:* "[I]f a State provides that a specific component of a prohibited transaction shall give rise both to a special stigma and to a special punishment, that component must be treated as a 'fact necessary to constitute the crime' within the meaning of our holding in *In re Winship."* 477 U. S., at 103 (STEVENS, J., dissenting). See *Apprendi, supra,* at 483–484.

Nor should *stare decisis* dictate the outcome in this case; the *stare decisis* effect of *McMillan* is considerably weakened for a variety of reasons. As an initial matter, where the Court has wrongly decided a constitutional question, the force of *stare decisis* is at its weakest. See *Ring* v. *Arizona, post,* at 608; *Agostini* v. *Felton,* 521 U. S. 203, 235 (1997). And while the relationship between punishment and the constitutional protections attached to the elements of a crime traces its roots back to the common law, *McMillan* was decided only 16 years ago.[5] No Court of Appeals, let alone this Court, has held that *Apprendi* has retroactive effect. The United States concedes, with respect to prospective application, that it can charge facts upon which a mandatory minimum sentence is based in the indictment and prove them to a jury. Tr. of Oral Arg. 42. Consequently, one is hard pressed to give credence to the plurality's suggestion that "[i]t is critical not to abandon" *McMillan* "at this late date." *Ante,* at 567. Rather, it is imperative that the Court maintain absolute fidelity to the protections of the individual af-

---

[5] Mandatory minimum sentence schemes are themselves phenomena of fairly recent vintage genesis. See *ante,* at 558–559; see also *Apprendi* v. *New Jersey,* 530 U. S. 466, 518 (2000) (THOMAS, J., concurring) ("In fact, it is fair to say that *McMillan* began a revolution in the law regarding the definition of 'crime.' Today's decision, far from being a sharp break with the past, marks nothing more than a return to the *status quo ante*—the status quo that reflected the original meaning of the Fifth and Sixth Amendments").

forded by the notice, trial by jury, and beyond-a-reasonable-doubt requirements.

Finally, before today, no one seriously believed that the Court's earlier decision in *McMillan* could coexist with the logical implications of the Court's later decisions in *Apprendi* and *Jones*. In both cases, the dissent said as much:

> "The essential holding of *McMillan* conflicts with at least two of the several formulations the Court gives to the rule it announces today. First, the Court endorses the following principle: '[I]t is unconstitutional for a legislature to remove from the jury the assessment of facts *that increase the prescribed range of penalties* to which a criminal defendant is exposed. It is equally clear that such facts must be established by proof beyond a reasonable doubt.' *Ante*, at 490 (emphasis added) (quoting *Jones, supra*, at 252–253 (STEVENS, J., concurring)). Second, the Court endorses the rule as restated in JUSTICE SCALIA's concurring opinion in *Jones*. See *ante*, at 490. There, JUSTICE SCALIA wrote: '[I]t is unconstitutional to remove from the jury the assessment of facts *that alter the congressionally prescribed range of penalties* to which a criminal defendant is exposed.' *Jones, supra*, at 253 (emphasis added). Thus, the Court appears to hold that any fact that increases or alters *the range* of penalties to which a defendant is exposed—which, by definition, must include increases or alterations to either the minimum or maximum penalties—must be proved to a jury beyond a reasonable doubt. In *McMillan*, however, we rejected such a rule to the extent it concerned those facts that increase or alter the minimum penalty to which a defendant is exposed. Accordingly, it is incumbent on the Court not only to admit that it is overruling *McMillan*, but also to explain why such a course of action is appropriate under normal principles of *stare decisis*." *Apprendi*, 530 U. S., at 533 (O'CONNOR, J., dissenting).

See also *Jones*, 526 U. S., at 268 (KENNEDY, J., dissenting) ("[B]y its terms, JUSTICE SCALIA's view . . . would call into question the validity of judge-administered mandatory minimum sentencing provisions, contrary to our holding in *McMillan*. Once the facts triggering application of the mandatory minimum are found by the judge, the sentencing range to which the defendant is exposed is altered"). There is no question but that *stare decisis* may yield where a prior decision's "underpinnings [have been] eroded, by subsequent decisions of this Court." *United States* v. *Gaudin*, 515 U. S. 506, 521 (1995).

Further supporting the essential incompatibility of *Apprendi* and *McMillan*, JUSTICE BREYER concurs in the judgment but not the entire opinion of the Court, recognizing that he "cannot easily distinguish *Apprendi* . . . from this case in terms of logic. For that reason, I cannot agree with the plurality's opinion insofar as it finds such a distinction." *Ante*, at 569 (opinion concurring in part and concurring in judgment). This leaves only a minority of the Court embracing the distinction between *McMillan* and *Apprendi* that forms the basis of today's holding, and at least one Member explicitly continues to reject both *Apprendi* and *Jones*. *Ante*, at 569 (O'CONNOR, J., concurring).

\* \* \*

"Conscious of the likelihood that legislative decisions may have been made in reliance on *McMillan*," in *Apprendi*, "we reserve[d] for another day the question whether *stare decisis* considerations preclude reconsideration of its narrower holding." 530 U. S., at 487, n. 13. But that day has come, and adherence to *stare decisis* in this case would require infidelity to our constitutional values. Because, like most Members of this Court, I cannot logically distinguish the issue here from the principles underlying the Court's decision in *Apprendi*, I respectfully dissent.