**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 12a0137n.06

**No. 10-3749**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | **FILED** |
|  | ) | **Feb 03, 2012** |
| Plaintiff-Appellant, | ) | LEONARD GREEN, Clerk |
|  | ) |  |
| v. | ) | ON APPEAL FROM THE UNITED |
|  | ) | STATES DISTRICT COURT FOR THE |
| JEFFREY A. JUSTICE, | ) | SOUTHERN DISTRICT OF OHIO |
|  | ) |  |
| Defendant-Appellee. | ) |  |

Before: BOGGS, ROGERS and SUTTON, Circuit Judges.

SUTTON, Circuit Judge. Jeffrey Justice, who goes by Jay, lives near his father, Jeffrey Justice, who goes by Jeff, in a rural area outside of Newark, Ohio. After gathering evidence that both Justices were involved in a large marijuana-trafficking operation, police sought and obtained search warrants for their properties. The district court granted Jay Justice's motion to suppress the evidence found in his home as well as a statement he made following the search. Because the officers who executed the search warrant could have relied in good faith on the magistrate's determination that the information supporting the warrant application established probable cause, we reverse.

I.

On December 18, 2009, the Newark police department received a tip from the Drug Enforcement Agency that a white tractor-trailer suspected of involvement in drug trafficking was parked at the home of Jay's father. Two officers set up surveillance of the property that afternoon and saw the father, the white truck and what looked like several large bales of marijuana inside a pole barn. When the truck pulled out of the barn and drove away, one of the officers followed it.

Three minutes after the truck left, one of the officers saw Jay Justice drive over to the barn from his house, located nearby. Jay helped his father move several items around the barn, including two large boats and several pieces of machinery.

In the meantime, the truck made its way to Interstate 70, where a highway patrolman pulled it over for speeding. After a drug dog reacted positively during a walk around the truck's exterior, the patrolman searched the truck and found $500,000 in cash wrapped in heat-shrunk plastic in a cardboard box. The driver admitted he had just delivered 518 pounds of marijuana to a barn matching the description of the one on the father's property and that he met two men there—one named Jeff, the other named Jay.

Armed with this information, officers sought search warrants for the two Justices' properties. One of the officers prepared an affidavit describing these facts and presented it to a state court judge. At a "search warrant proceeding," a municipal judge swore in the officer, and the prosecutor asked the officer questions about his knowledge of the Justices' activities. The officer told the judge that, although Jay Justice's tax returns revealed little income in recent years, he owned a $200,000 motor

home (in addition to his residence), and he frequently used the motor home to travel across the country to attend motocross races. The officer also mentioned anonymous tips that Jay sold marijuana from his house. The judge issued search warrants for both properties.

Officers executed both search warrants on December 20, 2009. They did not find any marijuana inside Jay's house, but they did find a transaction register and eight firearms. The officers advised Jay of his *Miranda* rights, and Jay admitted he was a convicted felon and the firearms belonged to him.

A federal grand jury returned an indictment charging Jay with being a felon in possession of a firearm. *See* 18 U.S.C. § 922(g). He filed a pretrial motion to suppress the evidence seized during the search and the statement he made to police admitting ownership of the guns, claiming two defects: (1) the affidavit contained a material false statement, incorrectly saying that Jeff Justice (the father) lived at Jay's address; and (2) the warrant application did not establish probable cause because it did not show a nexus between drug trafficking and Jay's house. The district court denied relief on the first ground, finding the mistake was a typo, but granted relief on the second ground. The court also suppressed the statement that Jay Justice made to police after the search as fruit of the poisonous tree. The United States filed this interlocutory appeal. *See* 18 U.S.C. § 3731.

II.

Because the "sole purpose" of the exclusionary rule "is to deter future Fourth Amendment violations," *Davis v. United States*, 564 U.S. ___, 131 S. Ct. 2419, 2426 (2011), a criminal defendant seeking to suppress the fruits of a search must do more than demonstrate that the police violated the Fourth Amendment. He must show that suppressing the evidence will yield "[r]eal deterrent value." *Id*. at 2427. That burden is especially relevant when officers follow the constitutionally preferred route, namely presenting evidence of illegal activity to a neutral magistrate who finds probable cause and issues a search warrant. *Ornelas v. United States*, 517 U.S. 690, 699 (1996). To suppress the fruits of such a search, a defendant must show that, despite the magistrate's authorization, the police could not have relied on the warrant in good faith. *See United States v. Leon*, 468 U.S. 897, 922 (1984). One way to do this is to demonstrate that the information presented in support of the warrant was "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *Id*. at 923.

In deciding whether the warrant application contained sufficient facts to support a reasonable belief in probable cause, we consider the facts set forth in the affidavit and the facts presented during the search warrant proceeding to the issuing judge. *United States v. Frazier*, 423 F.3d 526, 535–36 (6th Cir. 2005). Here are the facts: (1) officers observed a tractor-trailer believed to be involved in drug trafficking and bales of what appeared to be marijuana in a barn on the father's property; (2) shortly after the tractor-trailer left, officers saw Jay Justice drive over from his house and help his father move items around the barn; (3) when officers later pulled over the truck they

found $500,000 in cash inside and the driver admitted to meeting "a man named Jeff and a man named Jay" at the barn and delivering 518 pounds of marijuana, R. 16-1 at 5; (4) over the years, police had received tips that Jay obtained marijuana from his father and sold it from his home; and (5) Jay's lifestyle did not match the modest income he reported on his tax returns.

On this record, would it be "entirely unreasonable" for an officer to believe that probable cause had been established—that there was "a fair probability that contraband or evidence of a crime w[ould] be found" in Jay Justice's home? *Illinois v. Gates*, 462 U.S. 213, 238 (1983). Are these facts "completely devoid of any nexus" connecting Jay Justice's home with illegal activity? *United States v. Carpenter*, 360 F.3d 591, 595 (6th Cir. 2004) (en banc). No and no.

The facts presented to the judge show that Jay Justice was involved in a drug-trafficking operation, and a large one at that. "In the case of drug dealers, evidence is likely to be found where the dealers live." *United States v. Jones*, 159 F.3d 969, 975 (6th Cir. 1998); *see also United States v. Miggins*, 302 F.3d 384, 393–94 (6th Cir. 2002). Relying on this commonsense insight, we recently held that a warrant affidavit saying that a suspect had purchased large amounts of cocaine on several occasions supported the inference that he was engaged in drug trafficking and accordingly established probable cause to search his home. *United States v. Gunter*, 551 F.3d 472, 481–82 (6th Cir. 2009). As in *Gunter*, this warrant affidavit contained evidence directly tying Justice to drug-trafficking. The driver who delivered more than 500 pounds of marijuana to the father's barn told police that "a man named Jay" was present when he made the delivery. R. 16-1 at 5. Officers also saw Jay Justice help his father move items around the barn, presumably to make room for the new

product. And despite having reported little income on his tax returns for the past several years, Jay led a relatively expensive lifestyle. Jay's money came from somewhere, and the other evidence could convince a reasonable officer that it came from dealing drugs. *See United States v. Humphrey*, 287 F.3d 422, 431–32 (6th Cir. 2002), *overruled on other grounds by Harris v. United States*, 536 U.S. 545 (2002).

Officers also had received reports over the years that Jay obtained marijuana from his father and sold it to customers out of his house. True, neither the affidavit nor Officer Romano's testimony before the issuing judge provided any specifics about these alleged reports, such as who made them and when the transactions took place. But even though anonymous tips of this sort may not support a good-faith belief in probable cause on their own, the other evidence of Justice's involvement in the marijuana-trafficking operation corroborated the tips. Anonymous tips assume a higher status in the probable-cause calculation when other independent evidence corroborates them. *See United States v. Thomas*, 605 F.3d 300, 307–08 (6th Cir. 2010); *United States v. Dyer*, 580 F.3d 386, 391–92 (6th Cir. 2009). Taken together, the anonymous tips that Jay sold marijuana from his home and the other evidence in the warrant application support a reasonable belief that the warrant and affidavit could have established probable cause of evidence of drug trafficking in Jay's house.

Neither *United States v. McPhearson*, 469 F.3d 518 (6th Cir. 2006), nor *United States v. Laughton*, 409 F.3d 744 (6th Cir. 2005), nor *United States v. Hython*, 443 F.3d 480 (6th Cir. 2006), is to the contrary. In each case we held that the affidavit accompanying the search warrant was so deficient that no reasonable officer could believe it established probable cause. *McPhearson*, 469

F.3d at 527; *Laughton*, 409 F.3d at 751; *Hython*, 443 F.3d at 489. The affidavit in *McPhearson* stated only that officers found a small amount of cocaine, 6.4 grams, in the suspect's front pocket when they arrested him in front of his house on an unrelated charge. 469 F.3d at 521. Unlike the warrant affidavit here, that affidavit contained no evidence that the suspect was selling drugs. *Id*. at 527. The affidavit in *Laughton* stated only that a confidential informant had told police that the suspect kept drugs on his person and stashed in his home. 409 F.3d at 751. The affidavit contained no corroborating evidence and did not even allege that the informant had purchased drugs from the suspect. *Id*. Here, by contrast, officers presented the issuing judge with evidence of anonymous tips that Justice sold marijuana from his house, which corroborated the other evidence that he was involved in drug trafficking with his father. And the affidavit in *Hython* suffered from a staleness problem because, although it said that officers had observed a single controlled buy from the suspect's apartment, it did not say *when* the controlled buy occurred. 443 F.3d at 486–87. The affidavit in this case suffers from no such infirmity, as it said that Justice had participated in the receipt of more than 500 pounds of marijuana just hours before the warrant issued.

## III.

For these reasons, we reverse and remand to the district court for further proceedings.