Justice Breyer,
with whom Justice Kennedy and Justice Alito join, dissenting.
Where a criminal fine is at issue, I believe the Sixth Amendment permits a sentencing judge to determine sentencing facts—facts that are not elements of the crime but are relevant only to the amount of the fine the judge will impose. Those who framed the Bill of Rights understood *361 that “the finding of a particular fact” of this kind was ordinarily a matter for a judge and not necessarily “within ‘the domain of the jury.’ ” Oregon v. Ice, 555 U. S. 160, 168 (2009) (quoting Harris v. United States, 536 U. S. 545, 557 (2002) (plurality opinion)). The Court’s contrary conclusion, I believe, is ahistorical and will lead to increased problems of unfairness in the administration of our criminal justice system.
I
Although this dissent does not depend upon the dissents in Apprendi v. New Jersey, 530 U. S. 466 (2000), and its progeny, summarizing those earlier dissents will help the reader understand this one. See id., at 523-554 (O’Connor, J., dissenting); id., at 555-556 (Breyer, J., dissenting); see also United States v. Booker, 543 U. S. 220, 327 (2005) (Breyer, J., dissenting in part) (citing cases); Blakely v. Washington, 542 U. S. 296, 329 (2004) (Breyer, J., dissenting) (same). The Apprendi dissenters argued that the law had long distinguished between (1) facts that constitute elements of the offense and (2) facts relevant only to sentencing. The term “elements of the offense” means “constituent parts of a crime ... that the prosecution must prove to sustain a conviction.” Black’s Law Dictionary 597 (9th ed. 2009). The statute that creates the crime in question typically sets forth those constituent parts. And a jury must find the existence of each such element “beyond a reasonable doubt.” See, e. g., United States v. Gaudin, 515 U. S. 506, 510 (1995); In re Winship, 397 U. S. 358, 364 (1970).
Thus, a bank robbery statute might prohibit an offender from (1) taking by force or by intimidation (2) in the presence of another person (3) a thing of value (4) belonging to, or in custody of, a bank. In that case, the jury can convict only if it finds the existence of each of these four factual “elements” beyond a reasonable doubt. But it need not find other facts beyond a reasonable doubt, for these four factual elements alone constitute the crime.
*362 Other facts may be relevant to the length or kind of sentence the court will impose upon a convicted offender. These sentencing facts typically characterize the manner in which the offender carried out the crime or set forth relevant features characterizing the offender. For example, in respect to manner, an offender might have carried out a particular bank robbery
“with (or without) a gun, which the robber kept hidden (or brandished), might have frightened (or merely warned), injured seriously (or less seriously), tied up (or simply pushed) a guard, teller, or customer, at night (or at noon), in an effort to obtain money for other crimes (or for other purposes), in the company of a few (or many) other robbers . . . .” United States Sentencing Commission, Guidelines Manual §1A1.3, p. 3 (Nov. 2011) (USSG).
In respect to characteristics of the offender, a current bank robbery conviction might be that offender’s first (or his fourth) criminal conviction.
Traditionally, sentencing facts help the sentencing judge determine where, within a broad statutory range of, say, up to 20 years of imprisonment, the particular bank robber’s punishment should lie. The Apprendi dissenters concluded that the Constitution did not require the jury to find the existence of those facts beyond a reasonable doubt. Rather the law, through its rules, statutes, and the Constitution’s Due Process Clause, would typically offer the defendant fact-finding protection. See, e. g., Fed. Rule Crim. Proc. 32 (federal presentence report prepared by probation office sets forth facts, which defendant may contest at sentencing proceeding); Almendarez-Torres v. United States, 523 U. S. 224, 239-247 (1998) (constitutional inquiry).
The dispute in Apprendi and its line of cases arose after Congress and many States codified these sentencing facts during the sentencing reform movement of the 1970’s and *363 1980⅛. Congress, for example, concluded that too many different judges were imposing too many different sentences upon too many similar offenders who had committed similar crimes in similar ways. It subsequently enacted the Sentencing Reform Act of 1984, creating a federal Sentencing Commission which would produce greater uniformity in sentencing through the promulgation of mandatory uniform Guidelines structuring how judges, in ordinary cases, should typically use sentencing facts to determine sentences. 28 U.S.C. §§ 991, 994 (2006 ed. and Supp. IV); see also 18 U. S. C. §§ 3553(b)(1), 3742(e). The Apprendi-line majority agreed that, where a statute set a higher maximum sentence, a Commission might structure how a judge found sentencing facts relevant to the sentence imposed below that otherwise applicable maximum, at least if the resulting guidelines were not mandatory. See Booker, supra, at 245. But the majority held that where a sentencing fact increased the otherwise applicable maximum penalty, that fact had to be found by a jury. Apprendi, supra, at 490,
As I have said, the dissenters thought that the Sixth Amendment did not require a jury to find any of these sentencing facts. Why, asked the dissenters, should Congress’ or a State’s desire for greater sentencing uniformity achieved through statutes seeking more uniform treatment (of similar offenders committing similar offenses in similar ways) suddenly produce new Sixth Amendment jury trial requirements?
Those requirements would work against greater sentencing fairness. To treat all sentencing facts (where so specified in a statute or rule) as if they were elements of the offense could lead Congress simply to set high maximum ranges for each crime, thereby avoiding Apprendi’s jury trial requirement. Alternatively, Congress might enact statutes that more specifically tied particular punishments to each crime (limiting or removing judicial discretion), for example, mandatory minimum statutes. But this system would *364 threaten disproportionality by insisting that similar punishments be applied to very different kinds of offense behavior or offenders. Apprendi’s jury trial requirements might also prove unworkable. Consider the difficulty of juries’ having to find the different facts in the bank robbery example I have set forth above. Moreover, how is a defendant, arguing that he did not have a gun, alternatively to argue that, in any event, he did not fire the gun?
Finally, the dissenters took a different view of Sixth Amendment history. They believed that under the common law and at the time the Constitution was ratified, judges, not juries, often found sentencing facts, i. e., facts relevant only to the determination of the offender’s punishment. See, e. g., Booker, 543 U. S., at 329 (Breyer, J., dissenting in part); Apprendi, 530 U. S., at 527-529 (O’Connor, J., dissenting).
The dissenters lost the argument. The Court in Apprendi held that (other than the fact of a prior conviction) “any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt.” Id., at 490. But the dissenters’ views help to explain why I continue to believe this Court should not extend Apprendi’s rule beyond “‘the central sphere of [its] concern.’ ” Ice, 555 U. S., at 172 (quoting Cunningham v. California, 549 U. S. 270, 295 (2007) (Kennedy, J., dissenting)). That is the Court’s view, too, as set forth in Ice. And I base my dissent here primarily upon Ice.
II
This case involves sentencing facts, not elements of a crime. The criminal statute at issue constitutes one part of the Resource Conservation and Recovery Act of 1976 (RCRA), which, among others things, authorizes the Environmental Protection Agency to create a list of hazardous wastes. 42 U. S. C. § 6921. The criminal statute says:
“Any person who . . . knowingly treats, stores, or disposes of any hazardous waste identified or listed under *365 [RCRA] . . . without [an RCRA-authorized] permit . . . shall, upon conviction, he subject to a fine of not more than $50,000 for each day of violation, or imprisonment not to exceed . . . five years . . . , or both.” § 6928(d)(2)(A).
No one here denies that this statute creates a crime with four elements: (1) knowing treatment, storage, or disposal of a waste (2) that is hazardous, (3) without a permit, and (4) knowing that the waste has a substantial potential of causing harm to others or to the environment. App. 129-130; see Brief for Petitioner 30.
The number of “day[s] of each violation,” however, is not an additional element of the crime. The statute says that the number of days becomes relevant only “upon conviction” of the crime as previously defined. Moreover, the number of days is relevant to application of only one of two kinds of punishment that the statute mentions (fine and imprisonment); one cannot easily read this statute as creating two separate crimes identical but for the punishment. Finally, Congress did not include here, as it sometimes has done, statutory words such as “each day of violation shall constitute a separate violation.” E. g., 47 U. S. C. § 223(b); see also 42 U. S. C. § 4910(b). Rather, as in many other similar statutes, the statute here sets forth the crime and kinds of punishments (fine and imprisonment), while separately specifying facts that determine the maximum punishment of one kind (fines).
In this particular case, the indictment set forth a violation period of 762 days (from “on or about September 19, 2002 until on or about October 19, 2004”). App. 104. The jury’s guilty verdict did not specify the number of days on which the defendant committed the offense. Id., at 141. But after the conviction and sentencing hearing, the judge found that, among other things, the “clear and essentially irrefutable” evidence at trial supported the conclusion set forth in the presentence report, namely, that the maximum fine available amounted to $50,000 per day for 762 days—or *366 $38.1 million. App. to Pet. for Cert. 47a-48a. The judge imposed a fine of $6 million along with a $12 million community service obligation. App. 162-163.
f—{ I—Í
Apprendi says that “any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt.” 530 U. S., at 490. The number of days (beyond one) on which the defendant violated this criminal statute is such a fact. Nonetheless, like the majority, I believe that Apprendi’s rule does not automatically control the outcome in this case.
That is because this case concerns a fine, not, as in Ap-prendi, a term of imprisonment. And we made clear in Oregon v. Ice, 555 U. S. 160, that Apprendi does not encompass every kind of fact-related sentencing decision that increases the statutory maximum. In Ice, we considered Apprendi’& application to a sentencing decision about whether two prison sentences for conviction of two separate crimes (e. g., illegal drug possession and illegal gun possession) would run concurrently or consecutively. 555 U. S., at 163. An Oregon statute required a concurrent sentence unless the sentencing judge found certain facts. Id., at 165. Those facts could make a large difference in a term of imprisonment. Their presence could mean that a 5-year sentence for illegal drug possession and a 5-year sentence for illegal gun possession would amount to 10 years of imprisonment rather than 5 (indeed, in Ice itself, the judge’s factfinding increased the sentence by 20 years, see id., at 166, and n. 5). Thus, the presence of those “factfej” could “increas[e] the penalty” beyond what would otherwise be “the prescribed statutory maximum.” Id., at 167 (internal quotation marks omitted). Nonetheless, we held that the Sixth Amendment permitted a judge—it did not require a jury—to make that factual determination. Id., at 164.
*367 We consequently concluded that Apprendi does not encompass every kind of fact-related sentencing decision that increases the statutory maximum. In doing so, we wrote that the “animating principle” of Apprendi’s rule “is the preservation of the jury’s historic role as a bulwark between the State and the accused at the trial for an alleged offense.” 555 U. S., at 168. And we refused to extend Apprendi’s rule to a new category of sentence-related facts for two basic reasons.
First, we considered a historical question, namely, whether “the finding of a particular fact was understood as within ‘the domain of the jury ... by those who framed the Bill of Rights.’ ” 555 U. S., at 168 (quoting Harris, 536 U. S., at 557). And we read the “historical record” as showing that “in England before the founding of our Nation, and in the early American States,” the jury “played no role in the decision to impose sentences consecutively or concurrently.” 555 U. S., at 168-169 (footnote omitted). Rather, that decision “rested exclusively with the judge.” Id., at 168.
Second, recognizing that “administration of a discrete criminal justice system is among the [States’] basic sovereign prerogatives,” we considered the need to “respect . . . state sovereignty.” Ibid. We expressed concern lest application of Apprendi to this kind of decision inhibit state legislative efforts to establish a fairer sentencing system by helping to bring about more uniform sentencing. Ice, 555 U. S., at 171. We concluded that “[n]either Apprendi nor our Sixth Amendment traditions compel strait jacketing the States” in this respect. Ibid.
This case presents another new category of fact-related sentencing decisions, namely, decisions about the amount of a fine. Thus, as the majority recognizes, we must begin with a historical question. Ante, at 352-353. Who—judge or jury—found the facts that determine the amount of a criminal fine “in England before the founding of our Nation, and in the early American States?” Ice, supra, at 169 (foot *368 note omitted). Unlike the majority, I believe the answer to this question is that, in most instances, the judge made that determination.
IV
A
Apprendi relied heavily upon the fact that in “England before the founding of our Nation” the prescribed punishment for more serious crimes, i. e., felonies, was typically fixed—indeed, fixed at death. 530 U. S., at 478-480; see J. Baker, An Introduction to English Legal History 512 (4th ed. 2007); J. Beattie, Crime and the Courts in England, 1660-1800, pp. 409, 450-451 (1986) (hereinafter Beattie); Langbein, The English Criminal Trial Jury on the Eve of the French Revolution, in The Trial Jury in England, France, Germany 1700-1900, pp. 13, 16, 36-37 (A. Schioppa ed. 1987). The facts related to the application of that punishment were typically elements of the crime. And the jury, not the judge, determined the existence of those facts. See 4 W. Blackstone, Commentaries on the Laws of England 343 (1769) (hereinafter Blackstone); see also Baker, supra, at 512-518 (in practice, the jury or judge could ameliorate capital punishment through application of doctrines such as “pious perjury,” “benefit of clergy,” and reprieves, or the King could grant a royal pardon); Beattie 419-435 (same).
Punishment for lesser crimes, however, included fines. And under the common law, the judge, not the jury, determined the amount of the fine and the sentencing facts relevant to the setting of that amount. See Baker, supra, at 512; Beattie 459. Pertinent sentencing facts typically concerned the manner in which the offender committed the crime and the characteristics of that offender. See id., at 456-460. Thus, in 1769, Blackstone wrote:
“Our statute law has not therefore often ascertained the quantity of fines, nor the common law ever; it directing such an offence to be punished by fine, in general, *369 without specifying the certain sum.” Blackstone 372 (emphasis added).
That is because
“[t]he quantum, in particular, of pecuniary fines neither can, nor ought to be, ascertained by any invariable law. The value of money itself changes from a thousand causes; and, at all events, what is ruin to one man’s fortune, may be [a] matter of indifference to another’s.” Id., at 371.
Moreover, the “quantum” of pecuniary fines
“must frequently vary, from the aggravations or otherwise of the offence [i. e., the manner in which the crime was committed], the quality and condition of the parties [e. g., the offender’s characteristics], and from innumerable other circumstances.” Ibid.
Similarly, the 18th-century statesman and treatise writer Baron Auckland pointed out that in 10th-century England pre-Norman law had attached a fixed financial penalty to each specific crime. Principles of Penal Law 69 (2d ed. 1771). That law, for example, imposed a penalty of 3 cows for perjury and 12 cows for the rape of a maid. Ibid. This system, Baron Auckland added, ignored variations in, for example, the differing value of a fixed fine, say a cow, over time and among individuals; it also ignored the manner in which the offense was committed and the characteristics of the offender. Id., at 69-72. For those reasons, 18th-century English law ordinarily left “the quantum of the fine” to “the discretion of the Judges.” Id., at 68 (emphasis deleted).
“[Because t]he enormity and tendency of the crime, the malice and wilfulness of the intention, the inconsiderateness and suddenness of the act, the age, faculties, and fortune of the offender, form a chain of complex questions; which can be resolved only by the evidence of each separate charge, and for which no human foresight can *370 provide . . . then arises a necessary appeal to the breast of the judge.” Id., at 72 (emphasis added).
The only generally applicable limitations on the judge, when imposing the fine, were those contained in the English Bill of Rights and the Magna Carta. 1 W. & M., ch. 2, § 11, in 3 Eng. Stat. at Large 440 (forbidding “excessive Fines”); Magna Carta § 20, 9 Hen. III, § 14, in 1 Eng. Stat. at Large 5 (1225) (fine cannot deprive offender of means of livelihood); see Auckland, supra, at 73 (so interpreting Magna Carta); Blackstone 372-373 (same).
To be sure, the jury, not the judge, would determine the facts that made up the elements of the crime, even though those elements might be relevant to whether a fine could apply and, if so, the amount of the fine imposed as well. The common law, for example, defined larceny as the theft of goods that had some intrinsic value and divided the offense into grand larceny, which was theft of goods valued at more than a shilling, and petit larceny, which was theft of goods worth less than a shilling. Id., at 229-234; Langbein, supra, at 16-17; see also Beattie 424 (whether “benefit of clergy” was available depended on value stolen). Consequently, the jury would determine the value of the goods in question. In doing so, the jury might “manipulate the sentence by valuing the goods at under a shilling and thereby spare the defendant the capital sanction.” Lillquist, The Puzzling Return of Jury Sentencing: Misgivings About Apprendi, 82 N. C. L. Rev. 621, 636 (2004). But otherwise “the jury could not influence what other penalties” like fines the defendant might face because in “non-capital criminal cases” the amount of punishment “was left solely in the hands of the justices.” Ibid.
I cannot determine with any certainty the extent to which 18th-century law placed other relevant limitations upon the judges’ authority to determine fine-related sentencing facts. I have found an 1814 English treatise on criminal pleading that says, unlike in cases “where to constitute the offence *371 the value must [only] be of a certain amount,” in cases “where the offence, or its defined measure of punishment, depends upon the quantity of that excess ... a variance from the amount averred ... will be fatal.” 1 T. Starkie, A Treatise on Criminal Pleading 187-188 (emphasis deleted). It then adds that “in the case of usury, where the judgment depends upon the quantum taken, the usurious contract must be averred according to the fact; and a variance from it, in evidence, would be fatal, because the penalty is apportioned to the value.” Id., at 188. And an 18th-century treatise says that it is questionable whether it is necessary “to set forth the Value of the Goods in an Indictment of Trespass/or any other Purpose than to aggravate the Fine.” 2 W. Hawkins, A Treatise of the Pleas of the Crown, ch. 25, § 75, pp. 234-235 (3d ed. 1739) (emphasis added). One might read these statements as supporting the majority, for they might indicate that, where a statute sets forth facts that determine a pecuniary penalty, then a jury, not judge, would determine those facts.
But whether that is the correct reading is unclear. For one thing, prosecutions for economic crimes were usually brought by injured parties and the “fine” in such cases went in whole or in part to compensate that party for damages. See Beattie 35-36, 192. For example, immediately following the sentence I have just quoted, Hawkins wrote that it is questionable whether it is necessary “to set forth the Value of the Goods ... in an Indictment of Larceny for any other Purpose than to sh[o]w that the Crime amounts to grand Larceny, and to ascertain , the Goods, thereby the better to [e]ntitle the Prosecutor to a Restitution.” Hawkins, supra, at 234-235 (emphasis added; footnote omitted). Likewise, Blackstone dated English usury law back to a 1545 statute that provided as the penalty that the offending lender shall both “make f[i]ne ... at the King’s will and pleasure” and forfeit “treble value” of the money borrowed—with half to the King and the other half “to him or them that will sue *372 for the same” 37 Hen. VIII, ch. 9, in 3 Stat. of Realm 997 (emphasis added); see Blackstone 156; see also M. Ord, An Essay on the Law of Usury 122-128 (3d ed. 1809) (treble-value forfeitures recovered through information qui tarn but discretionary fines recovered through criminal indictment). Thus, the statutes at issue were what American courts would later call quasi-civil statutes—part civil, part criminal; see also Beattie 457.
Parliament consequently would have had a special reason for requiring jury determinations of the amount of the pecuniary penalty. And Parliament had the authority to depart from the common law and to insist that juries determine sentencing facts without establishing a generally applicable principle. The relevant question here is how often and for what purposes Parliament did so. Blackstone himself wrote that such statutes fixing fines in amounts were both in derogation of the common law and uncommon. Blackstone 372. Finally, no one here argues that we adopt the rule actually suggested by the treatises. That rule is not that sentencing is to be done according to value found by the jury but instead that a discrepancy between the value alleged and value found by the jury might render the entire case fatal. See Starkie, supra, at 188.
Thus, I cannot place great weight upon these statutes. The parties did not refer to them in their briefs. And in any event, the historical sources taken together make clear that the predominant practice in 18th-century England was for a judge, not a jury, to find sentencing facts related to the imposition of a fine.
Indeed, the Court in Apprendi conceded the point. It distinguished 18th-century punishments for greater crimes (fixed punishments) from punishments for lesser crimes (included fines). 530 U. S., at 480, n. 7. And it wrote that “judges most commonly imposed discretionary ‘sentences’ of fines . . . upon misdemeanants.” Ibid. (emphasis added). *373 Insofar as 18th-century English practice helps determine what the Framers would have thought about the scope of the Constitution’s terms—here, the Sixth Amendment’s right to trial by an impartial jury—that practice suggests they would not have expected that right to include determination of sentencing facts relevant only to the imposition of a fine.
B
Practice in the “early American States” is even less ambiguous. In the colonial era, judges would normally determine the amount of a fine (within an unlimited or otherwise broad range) while also determining related sentencing facts (say, about the manner in which the offender committed the crime and the offender’s characteristics). Legal historians tell us that in the American Colonies a criminal fine was “overwhelmingly the most common of the non-capital punishments,” that in most instances the range of the fine was “apparently without limit except insofar as it was within the expectation on the part of the court that it would be paid,” that the judge established the precise amount of the fine, and that the amount was “tailored individually to the particular case.” Preyer, Penal Measures in the American Colonies: An Overview, 26 Am. J. Legal Hist. 326, 350 (1982). “[C]olo-nial judges, like their English brethren, possessed a great deal of discretion” and could set the amount of fine “depending upon the nature of the defendant and the crime.” Lillquist, 82 N. C. L. Rev., at 640-641.
Enactment of the Constitution and Bill of Rights did not change this practice. Some early American statutes specified that the judge has discretion to set the amount of the fine while saying nothing about amount. E. g., Crimes Act of 1790, ch. 9, § 21, 1 Stat. 117 (any person who bribes a judge “on conviction thereof shall be fined and imprisoned at the discretion of the court”); § 28, id., at 118 (any person who does violence to an ambassador or public minister, “on con *374 viction, shall be imprisoned not exceeding three years, and fined at the discretion of the court”). Others set only a maximum limitation. E. g., Act of Mar. 3, 1791, ch. 15, § 39, 1 Stat. 208 (officer of inspection convicted of oppression or extortion “shall be fined not exceeding five hundred dollars, or imprisoned not exceeding six months, or both, at the discretion of the court”). In respect to these statutes, Justice Iredell wrote in 1795 that the “common law practice ... must be adhered to; that is to say, the jury are to find whether the prisoner be guilty, and . . . the court must assess the fine.” United States v. Mundell, 27 F. Cas. 23, 24 (No. 15,834) (CC Va.).
Still other statutes, as in England, specifically keyed the amount of the fine to a specific factual finding. A section of the Crimes Act of 1790, for example, said that any person who upon United States property or the high seas “shall take and carry away, with an intent to steal or purloin the personal goods of another . . . shall, on conviction, be fined not exceeding the fourfold value of the property so stolen.” § 16, 1 Stat. 116. This crime has several elements: (1) taking and (2) carrying away (3) with intent to steal (4) personal goods (5) belonging to another (6) on United States property or the high seas. The jury must find the existence of these facts beyond a reasonable doubt to establish a conviction. But the statute also says that the fine cannot exceed “the fourfold value of the property so stolen.” And it thereby requires the finding of a sentencing fact, namely, the value of the stolen property. Who would make this determination— judge or jury?
Unlike in 18th-century England, in the United States there is case law directly answering the question. In United States v. Tyler, 7 Cranch 285 (1812), this Court considered a federal embargo statute making it a crime to “put” certain “goods” on board a ship with intent to “export” them outside of the United States. See Act of Jan. 9, 1809, ch. 5, § 1, 2 Stat. 506. The statute also provided that an offender’s *375 “goods” and ship “shall be forfeited,” and the offender “shall, upon conviction,” be “fined a sum, by the court before which the conviction is had, equal to four times the value of such specie, goods, wares and merchandise.” Ibid. The statute thereby required determination of a sentencing fact, namely, “the value of such . . . goods.” Was the finding of this sentencing fact for the judge or for the jury?
In Tyler, the defendant had been indicted for attempting to export 19 barrels of pearl-ashes, valued at $600. Ante, at 357-358. The jury convicted the defendant, but when doing so, it said that it found the defendant guilty of having tried to export “ ‘pot-ashes ... worth two hundred and eighty dollars.’ ” 7 Cranch, at 285 (emphasis deleted). The defendant appealed, claiming a difference between the jury’s basis for conviction and the crime as charged in the indictment. The difference between the words “pearl-ashes” and “pot-ashes” is unlikely to have mattered, for pearl-ash is simply a refined grade of pot-ash (potassium carbonate). See T. Barker, R. Dickinson, & D. Hardie, Origins of the Synthetic Alkali Industry in Britain, 23 Economica 158, 163 (1956). Thus, the defendant did not focus upon that difference. Rather, he claimed that the jury’s verdict “was not sufficiently certain as to the value of the property charged in the indictment.” Tyler, 7 Cranch, at 285 (emphasis added). Because $280 differs from $600, the jury had not found him guilty of the crime charged.
The Supreme Court, however, found that the jury’s finding as to valuation was not relevant. It upheld the conviction because it was “of [the] opinion that, under this law, no valuation by the jury was necessary to enable the Circuit Court to impose the proper fine.” Ibid. (emphasis added). The Court did not say explicitly that the Sixth Amendment permitted the judge to find the relevant sentencing fact. See ante, at 358. But it seems unlikely that a Court that included Chief Justice John Marshall, Justice Joseph Story, and others familiar with both the common law and the Constitu *376 tion would have interpreted a federal statute as they did if either contemporary legal practice or the Constitution suggested or required a different interpretation.
Nor can we say that the Court did not fully consider the matter. Justice Story later authoritatively interpreted Tyler. Sitting as a Circuit Justice in United States v. Mann, 26 F. Cas. 1153 (No. 15,717) (CCNH 1812), he considered the same judge/jury question in respect to the same embargo statute. His court wrote that in “Tyler, 7 Cranch 285, in a prosecution on this same clause, the court held that the fine and quadruple value must be assessed and adjudged by the court, and not by the jury.” Ibid, (emphasis added); see also 26 F. Cas. 1153, 1155 (No. 15,718) (CCNH 1812) (Story, J.) (noting that the Supreme Court would not have reached its result unless satisfied “that the fine was to be imposed by the court, and not found by the jury”).
Thus, nothing in early American practice suggests that the Framers thought that the Sixth Amendment jury trial right encompassed a right to have a jury determine fine-related sentencing facts. But, to the contrary, there is a Supreme Court opinion, namely, Tyler, that holds, or at least strongly indicates, the opposite.
C
The majority reaches a different conclusion. But the majority does not pose what I believe to be the relevant historical question, namely, whether traditionally “in England before the founding of our Nation, and in the early American States,” see Ice, 555 U. S., at 169 (footnote omitted), judges, not juries, normally determined fine-related sentencing facts. Instead, it asks whether a jury, rather than the judge, found those facts in that subclass of cases where a statute “peg[ged] the amount of a fine to the determination of specified facts.” Ante, at 354. It concludes that “the predominant practice was for such facts to be alleged in the indictment and proved to the jury.” Ibid.
Putting the question this way invites a circular response. As is true of the English usury cases, nothing prohibits a *377 legislature from requiring a jury to find a sentencing fact in a particular subset of cases. And obviously when a State does so, the jury will indeed have to find those facts. Thus, if, say, 10 States decide to make juries find facts that will set the fine for, say, simple larceny, then jury practice in those States (during, say, the 19th century) will include the jury’s finding of those sentencing facts. But that circumstance tells us only that in those 10 States for those specific statutes the legislatures so required. It tells us little, if anything, about practices in most States, and it tells us nothing at all about traditional practice in England or 18th-century America. Nor does a discovery that, say, 10 state legislatures once required juries, rather than judges, generally to set fines tell us about the scope of the Sixth Amendment’s constitutional right to trial by jury. The matter is important because the majority rests its conclusion almost exclusively upon reports of mid-19th-century jury trials in a handful of States, namely, Alabama, Illinois, Indiana, Massachusetts, and New Hampshire, and a treatise that bases its statements upon those cases. Ante, at 354-856.
Scholars tell us that in fact there were about 10 States— including Alabama, Illinois, and Indiana—that (after ratification of the Sixth Amendment) enacted statutes that required juries, not judges, to determine a defendant’s punishment, including not only the length of a prison term but also the amount of a fine. See Iontcheva, Jury Sentencing as Democratic Practice, 89 Va. L. Rev. 311, 317 (2003); King, Origins of Felony Jury Sentencing in the United States, 78 Chi.-Kent L. Rev. 937, 963 (2003). The courts that considered this practice, however, did not believe that the constitutional right to jury trial compelled it.
Alabama’s Supreme Court, for example, explained that its State’s jury-sentencing system, which allowed the jury “to determine both the fine and imprisonment,” was in derogation of, and created “an innovation upon[,] the rules of the common law, so far as it transfers [those] powers from the court to the jury.” Hawkins v. State, 3 Stew. & P. 63 (1832). *378 Thus, in State v. Garner, 8 Port. 447 (1839), see ante, at 355, the malicious mischief statute at issue said that the offender would “ ‘be fined in such sum as the jury trying the same may assess, not exceeding four fold the value of the property injured or destroyed.’” 8 Port., at 448 (emphasis added). The statute, in other words, transferred all sentencing facts to the jury and was not illustrative of 18th-century practice. Further, the statute said that the “ ‘fine shall be paid to the party injured.’” Ibid. The court held that it was consequently proper to allege the amount of the property’s value in the indictment, not because the State’s constitution required any such thing, but because “the fine thus assessed, is for the benefit of the injured party”; the case “is, therefore, a quasi civil proceeding”; and for that reason “it would be more consonant to the rules of pleading, and to the principles which govern analogous cases, that the indictment should contain an averment of the value of the property.” Ibid.; Ord, Law of Usury, at 122-123 (usury as quasi-civil proceeding).
Illinois law was similar. Illinois became a jury-sentencing State in 1831. See Iontcheva, supra, at 317, n. 28 (citing Act of Feb. 15, 1831, § 42, 1830 Ill. Laws 103, 113). The Illinois Supreme Court subsequently wrote that, even though “at common law . . . juries . . . never were invested with the power of determining the character or extent of the punishment . . . , we are to be governed entirely by the provisions and enactments of our code of criminal jurisprudence.” Blevings v. People, 2 Ill. 172, 173 (1835). And in Clark v. People, 2 Ill. 117 (1833), see ante, at 354-355, the court made clear that the arson statute at issue
“ha[d] changed the common law . . . [that the] fine equal in value to the property burne[d] is imposed as part of the punishment[; hence,] [t]he indictment... should have charged the value of the property destroyed, [for] otherwise it could not properly have been inquired into by the jury.” 2 Ill., at 120-121.
*379 Indiana was another jury-sentencing State. Iontcheva, supra, at 317, n. 28; King, supra, at 937. Indiana case law decided before Indiana changed its system indicates that the judge could decide certain facts required to set the applicable maximum fine. E. g., Morris v. State, 1 Blackf. 37 (1819). But after Indiana became a jury-sentencing State, its courts held, not surprisingly, that under Indiana law the jury must determine sentencing facts. See Ritchey v. State, 7 Blackf. 168, 169 (1844); ante, at 355.
Massachusetts presents a special circumstance. The two Massachusetts cases that the majority cites, ante, at 354-355, are larceny cases. Value traditionally was an element of the crime of larceny—both because larceny was theft of goods that had some intrinsic value and because value distinguished grand larceny from petit larceny—and thus juries traditionally had to determine at least some facts about the value of the property stolen. See Blackstone 229, 234. Massachusetts had abolished the distinction between grand and petit larceny before its courts decided the two cases the majority cites. See Commonwealth v. Smith, 1 Mass. 245, 246 (1804). But those decisions nonetheless rest in significant part upon the jury’s traditional larceny factfinding role. In Hope v. Commonwealth, 50 Mass. 134 (1845), for example, the Massachusetts Supreme Judicial Court wrote:
“The well settled practice, familiar to us all, has been that of stating in the indictment the value of the article alleged to have been stolen.... The reason for requiring this allegation and finding of value may have been, originally, that a distinction might appear between the of-fences of grand and petit larceny .... Our statutes . .. prescribe the punishment for larceny, with reference to the value of the property stolen; and for this reason, as well as because it is in conformity with long established practice, the court are of opinion that the value of the property alleged to be stolen must be set forth in the indictment.” Id., at 136-137.
*380 The “long established practice” to which the court refers is larceny case practice, not practice in all criminal cases.
The New Hampshire case to which the majority refers, State v. Goodrich, 46 N. H. 186 (1865), ante, at 355, is also a larceny case that relied on the “established” larceny case practice. The court explained:
“The indictment ought to state the value of the articles stolen that it may appear whether the offence be grand or petit larceny, and such we believe is the settled practice. ... It has been held in some jurisdictions, that, in case no value is alleged, the offence charged may be regarded as simple larceny, and a conviction be had accordingly . . . but we think it best to adhere to the well established doctrine in such cases .... It may also be suggested, that, in the case of simple larceny, the respondent may be sentenced to pay the owner of the goods stolen, treble the value thereof, which is an additional reason for requiring the character of the offence to be stated.” 46 N. H., at 187-188.
The court wrote nothing to suggest that its holding rested on generally applicable constitutional grounds. And it was in the New Hampshire Federal Circuit Court a half century earlier when Justice Story had indicated that the Federal Constitution did not impose any such requirement. See Mann, 26 F. Cas., at 1155 (No. 15,718).
That leaves the majority’s puzzling 1895 Federal District Court case from Kansas. United States v. Woodruff, 68 F. 536; ante, at 355. The circumstances of this case are highly unusual, and the District Court’s reasoning as to why no fine could be set seems to have rested on a combination of statutory construction and constitutional principle. See Woodruff v. United States, 58 F. 766, 767-768 (CC Kan. 1893); Woodruff, 68 F., at 538-539. Still, I concede this case to the majority—as the lone swallow that cannot make the majority’s summer.
*381 Taken together, the 19th-century cases upon which the majority rests its holding do not show anything about practice in the vast majority of States. They concede that common-law practice was to the contrary. And they tell us little about the meaning of the Sixth Amendment. Even were that not so, I do not understand why these mid-19th-century cases should tell us more about the Constitution’s meaning than, say, the common 20th-century practice of leaving sentencing fact determinations to the judge. This Court apparently once approved the latter practice as constitutional. E. g., McMillan v. Pennsylvania, 477 U. S. 79 (1986); Almendarez-Torres, 523 U. S. 224. And these cases seem more closely related to the present topic.
D
The upshot is that both 18th-century English common law and 18th-century American law typically provided judges with broad discretion to assess fines. The judge, not the jury, would normally determine fine-related sentencing facts. In this respect, ordinary 18th-century sentencing practice related to fines was unlike sentencing practice in respect to felonies. In the latter case, in Apprendi’s view, punishment was normally “fixed” and the judge’s sentencing role was consequently minimal. 530 U. S., at 478-480. In the former case, namely, fines, the judge’s role was not normally minimal, but the opposite. For these reasons, I believe that allowing a judge to determine sentencing facts related to imposition of a fine does not invade the historic province of the jury. The historical test that we set forth in Ice is satisfied.
V
In Ice, we also took account of the practical extent to which extending Apprendi’s rule beyond the “ ‘central sphere of [its] concern’ ” would “diminish” the States’ “role” in “devising solutions to difficult legal problems . . . absent impelling reason to do so.” 555 U. S., at 171-172. In partic *382 ular, we feared that insisting that juries determine the relevant sentencing facts (concerning concurrent, as opposed to consecutive, punishment) would unjustifiably interfere with a State’s legislative efforts “to rein in the discretion judges possessed at common law to impose consecutive sentences at will.” Id., at 171. It would inhibit (indeed “straightjacket] ”) States seeking to make “concurrent sentences the rule, and consecutive sentences the exception.” Ibid. We said that we were “unclear how many other state initiatives would fall” if Apprendi were extended, and that expansion would be “difficult for States to administer.” 555 U. S., at 171-172. We believed that these considerations argued strongly against any such “expansion.”
Here, the same kinds of considerations similarly argue against “expansion” of Apprendi's rule. Today’s decision applies to the States. In the 1950’s and thereafter, States as well as the Federal Government recognized a serious problem in respect to the sentencing of corporations. Fines, imposed as a punishment upon corporate offenders, were both nonuniform (treating identical offenders differently) and too often they were set too low. Judges would frequently fine corporations in amounts that failed to approximate the harm a corporation had caused or the gain that it had obtained through its illegal activity, both because often the statutory máximums were low and because often the fines imposed tended to be substantially lower than those máximums. See Gruner, Towards an Organizational Jurisprudence: Transforming Corporate Criminal Law Through Federal Sentencing Reform, 36 Ariz. L. Rev. 407, 408 (1994); Kadish, Some Observations on the Use of Criminal Sanctions in Enforcing Economic Regulations, 30 U. Chi. L. Rev. 423, 435, n. 55 (1963); Nagel & Swenson, Federal Sentencing Guidelines for Corporations: Their Development, Theoretical Underpinnings, and Some Thoughts About Their Future, 71 Wash. U. L. Q. 205, 215 (1993).
*383 Consequently, the authors of the Model Penal Code adopted a model provision stating that, in respect to offenses involving financial gain, a court could impose an alternative “higher” fine “equal to double the pecuniary gain derived from the offense by the offender.” Model Penal Code § 6.03(5), 10A U. L. A. 259 (2001). New York soon thereafter adopted such a provision. N. Y. Penal Law Ann. § 80.10(2)(b) (West 2009). And other States followed New York’s example with similar provisions permitting judges to set fines equal to twice the gain to the offender or twice the loss to the victim, thereby helping to diminish disparity while helping potential victims by increasing deterrence. E. g., Conn. Gen. Stat. § 53a-44 (2011); Fla. Stat. § 775.083(1)(f) (2010). Many of these statutes say in particular that the “court” shall make the finding of gain or loss, in a separate hearing if necessary. E. g., N. Y. Penal Law Ann. § 80.00(3) (West 2009); N. J. Stat. Ann. § 2C:43-3(e) (West 2005).
The Federal Government followed suit. In some instances, such as RCRA, where environmental harm likely varies with the length of the violation period, Congress advanced its uniformity and deterrence goals by tying a dollar-limited fine to the length of time during which that violation took place. 42 U. S. C. § 6928(d)(2)(A). In other instances, it did so through a new general gain-or-loss provision, applying to all offenses, including such crimes as corporate fraud, antitrust violations, and environmental pollution. That provision says:
“Alternative Fine Based on Gain or Loss.—If any person derives pecuniary gain from the offense, or if the offense results in pecuniary loss to a person other than the defendant, the defendant may be fined not more than the greater of twice the gross gain or twice the gross loss, unless imposition of a fine under this subsection *384 would unduly complicate or prolong the sentencing process.” 18 U.S.C. § 3571(d).
To apply Apprendi’s rule to the fines set forth in such statutes, no less than in Ice, would weaken or destroy the States’ and Federal Government’s efforts “to rein in the discretion judges possessed at common law,” Ice, 555 U. S., at 171, over fines. Congress, in enacting such statutes, expected judges, not juries, to determine fine-related sentencing facts because doing so will often involve highly complex determinations. Where, say, major fraud is at issue, the full extent of the loss (or gain) may be unknown at the time of indictment or at any other time prior to the conclusion of the trial. And in an antitrust or an environmental pollution case, the jury may have particular difficulty assessing different estimates of resulting losses.
The consequence of the majority’s holding, insisting that juries make such determinations, is likely to diminish the fairness of the criminal trial process. A defendant will not find it easy to show the jury at trial that (1) he committed no environmental crime, but (2) in any event, he committed the crime only on 20 days, not 30. Moreover, the majority’s holding will sometimes permit prosecutors to introduce newly relevant evidence that would otherwise have been kept from the jury on the ground that it was cumulative or unduly prejudicial. If victims’ losses are relevant, the prosecutor may be able to produce witness after witness testifying only about the amount of life savings lost to the fraud. The defendant in this case, for example, thought the introduction of evidence about the discovery of mercury and remediation and evacuation of a nearby apartment complex was unduly prejudicial. Brief for United States 51 (citing App. 15 (defendant’s motion in limine to exclude such evidence)). But even if that were so, that evidence might now be admitted as showing the amount of harm caused or the number of days upon which the defendants unlawful activity took place.
*385 Administrative problems here may prove more serious than where, as in Apprendi, prison terms were at stake. In part, that is because corporate criminal cases often focus upon complex frauds, criminal price fixing, extended environmental pollution, food-and-drug safety violations, and the like. Both Congress and the Sentencing Commission have recognized as much. The federal criminal fine statute to which .1 earlier referred specifically creates an exception where assessing total loss or gain “would unduly complicate or prolong the sentencing process.” 18 U. S. C. § 3571(d). Similarly, Sentencing Guidelines applicable to corporations exclude fine provisions for environmental crimes (along with most crimes involving export violations, food-and-drug safety, agricultural-and-consumer products, and Racketeer Influenced and Corrupt Organizations Act violations) because of the “potential difficulty ... of defining and computing loss.” Nagel & Swenson, 71 Wash. U. L. Q., at 256; see USSG § 8C2.1, and comment., § 8C2.10. Where the defendant is ahúman being, the Government can avoid problems of proof simply by abandoning any effort to obtain a fine; instead, perhaps to the individual defendant’s dismay, the prosecution can seek a longer prison term. Where the criminal defendant is a corporation, however, no such possibility exists.
If, as seems likely, it becomes too difficult to prove fine-related sentencing facts to a jury, legislatures will have to change their statutes. Some may choose to return to highly discretionary sentencing, with its related risks of nonuni-formity. Others may link conviction with fines specified in amount, rather like the 10th-century pre-Norman system of three cows for perjury or more modern mandatory minimum penalties. As Blackstone pointed out, those systems produce sentences that are not proportionate; they tend to treat alike offenders who committed the same crime in very different ways. See 4 Blackstone 371-372.
The majority believes that 10 years of experience with Ap-prendi “attenuate^] ” any legal claim of reliance on a differ *386 ent rule of constitutional law here. Ante, at 360. Perhaps so. Perhaps that experience shows that Apprendi’s jury trial requirement is workable. But there is another less optimistic possibility.
Perhaps that experience, like the canary in a mine shaft, tells us only that our criminal justice system is no longer the jury-trial-based adversarial system that it once was. We have noted that “[n]inety-seven percent of federal convictions and ninety-four percent of state convictions are the result of guilty pleas.” Missouri v. Frye, 566 U. S. 134, 143 (2012). We have added that today “ ‘plea bargaining ... is not some adjunct to the criminal justice system; it is the criminal justice system.’” Id., at 144 (quoting Scott & Stuntz, Plea Bargaining as Contract, 101 Yale L. J. 1909, 1912 (1992)). And in such a system, complex jury trial requirements may affect the strength of a party’s bargaining position rather than the conduct of many actual trials.
At the same time, the prosecutor in such a system, perhaps armed with statutes providing for mandatory minimum sentences, can become the ultimate adjudicator. The prosecutor/adjudicator plays an important role in many “European inquisitorial” systems. But those prosecutors, unlike ours, typically are trained formally to be more like neutral adjudicators than advocates. Cf. Langbein & Weinreb, Continental Criminal Procedure: “Myth” and Reality, 87 Yale L. J. 1549, 1559 (1978); see, e. g., Ecole Nationale de la Magistra-ture. Today’s holding, by unnecessarily complicating the trial process, may prove workable only because it nudges our system slightly further in this direction. I see no virtue in doing so.
For these reasons, with respect, I dissent.